**Timothy HENSON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A05–0302–CR–73.**

Court of Appeals of Indiana.

June 23, 2003.

John (Jack) F. Crawford, Crawford & Devane, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Timothy Henson ("Timothy") was convicted of attempted murder, a Class A felony,[1] in Marion Superior Court and sentenced to serve fifty years executed. At trial, Timothy moved to suppress evidence of a telephone conversation, which was illegally intercepted with a modified police scanner. The trial court denied the motion finding that although the conversation was illegally intercepted, the police played no part in that illegal interception, and therefore the evidence was admissible. Timothy appeals his conviction raising two issues, which we restate as:

I. Whether the trial court abused its discretion when it denied Timothy's motion to suppress the evidence of the illegally intercepted telephone conversation; and,

II. Whether the trial court abused its discretion when it denied Timothy's motion for a mistrial.

We conclude that the trial court erred when it recognized a "clean hands" exception to the use of illegally intercepted communications and denied Timothy's motion to suppress.[2] However, the admission of that evidence constitutes harmless error. Also, the trial court did not abuse its discretion when it denied Timothy's motion for a mistrial. We therefore affirm.

### Facts and Procedural History

Timothy and Wesla Roberts ("Roberts") were engaged and living together until the end of September of 2001, when Roberts ended the relationship. On the day she moved out of their apartment, Roberts obtained a protective order against Timothy. After she ended the relationship, Timothy began to follow Roberts, call her at her workplace, and page her. Timothy also left messages for Roberts stating that he wanted to resume their relationship and that "he couldn't live without" her. Tr. p. 59.

---

1. Ind.Code § 35–42–1–1 (1998); § 35–41–5–1 (1998).

2. Because we resolve this issue under federal law, we need not address Timothy's argument that evidence of the illegally intercepted telephone conversation must be suppressed under Indiana's Wiretap Act codified at Indiana Code sections 35–33.5–1–1 through 35–33.5–5–6, although we find the Act's existence to be instructive in our consideration of federal law.

On November 9, 2001, at approximately 8:00 p.m., Roberts was in the parking lot of the American Bandstand restaurant on the northeast side of Indianapolis when she saw Timothy drive up behind her. Tr. p. 62. Therefore, she drove out of the parking lot and decided to go home. As she was stopped at a stoplight, Timothy pulled up along side her vehicle and starting yelling at her to pull over. Tr. pp. 64–65. Roberts became upset and started crying, and when the light changed, Roberts drove west onto 86th Street towards Keystone Avenue.

After she passed Keystone Avenue, Roberts turned onto Woodfield Crossing and then pulled her vehicle over to the side of the road because she was upset and needed to calm down. Tr. p. 68. Timothy caught up with Roberts, and when he arrived at her vehicle, he reached in through her open driver's side window, grabbed her, and stabbed her in the neck. Tr. p. 69. Eventually, Roberts was able to put her vehicle in reverse and drive away. She then drove to a gas station on Keystone Avenue and was able to get help. After she was admitted to the hospital, Roberts, who was unable to speak, stated in writing that Timothy was responsible for the stabbing. Tr. p. 75, Ex. Vol., State's Ex. 4, 5.

On November 14, 2001, Timothy was charged with attempted murder and aggravated battery, but he was not taken into custody because he could not be found. Marion County Sheriff's Deputy Gregory Scheid ("Deputy Scheid") was assigned to investigate the attempted murder of Roberts. After an unidentified individual contacted the hospital to inquire about Roberts' status, the hospital contacted Deputy Scheid and gave him the caller's telephone number. The caller was later identified as Paul Carey ("Carey").

On November 27, 2001, Deputy Scheid, accompanied by Detective Dave Wilkes, went to Carey's residence to speak with him about the calls he had made to the hospital. When Deputy Scheid arrived at the residence, Carey grabbed his arm and dragged the deputy into his kitchen. As he was doing so, Carey told Deputy Scheid that he had information about a man who "had cut a woman's throat." Tr. p. 180. Carey explained that he had a police scanner, which "was on all day long," that was intercepting telephone conversations, and that he "knew all of the frequencies for [the phone numbers] of all of his neighbors." Tr. p. 33. Deputy Scheid and Carey then listened to a telephone conversation between Timothy and his sister, Kimberly Henson ("Kimberly"), which was intercepted by the police scanner.

During the conversation, Kimberly warned Timothy that the police were looking for him.[3] Tr. p. 32. Also, Timothy told Kimberly that he needed clean clothing and money, and Kimberly arranged to take those items to Timothy at the house where he was staying. Tr. pp. 31–32. During the conversation, Timothy made

**3.** Kimberly has been charged with assisting a criminal, as a Class C felony, in Marion Superior Court, Criminal Court One, the same court in which Timothy was tried. Before Timothy's jury trial commenced, Kimberly filed a motion to suppress evidence of the November 27, 2001 telephone call. Judge Walton Pratt issued a written order denying Kimberly's motion. In doing so, Judge Walton Pratt relied on the Sixth Circuit's opinion in *United States v. Murdock*, 63 F.3d 1391 (6th Cir.1995), which created a "clean hands" exception to 18 U.S.C. § 2515 where the government played no part in intercepting the communication. Kimberly's interlocutory appeal challenging that ruling is also decided today in a memorandum decision by this panel. *See Kimberly Henson v. State*, No. 49A02–0209–CR–0774 (Ind. Ct.App. June 23, 2003).

several references to Roberts and stated that "if this went to trial, that he would attempt to make a[n] insanity plea." Tr. p. 33. After that telephone call ended, Timothy then made several telephone calls to various cell phone companies. Tr. p. 32. Both Deputy Scheid and Detective Wilkes remained at Carey's residence for over two hours listening to Timothy's various telephone calls over the police scanner. Timothy was taken into custody later that day.

A jury trial commenced on September 16, 2002. At trial, Timothy moved to suppress from "evidence any and all testimony or evidence concerning a telephone conversation allegedly heard by police on November 27, 2001 at the home of Paul Carey." Appellant's App. p. 76. At the hearing on the motion to suppress, Deputy Scheid testified that he was aware that it was illegal to record the conversation, but that he did not know it was illegal for him to listen to it or for Carey to intercept it. Tr. pp. 37–38. Although he testified that at the time he did not feel it was necessary to obtain a warrant, Deputy Scheid admitted that it would have been possible for either himself or Detective Wilkes to have attempted to obtain a warrant, but that they did not do so. Tr. p. 38. The trial court determined that interception of the telephone call was illegal,[4] but denied the motion as to the conversation between Timothy and Kimberly because Detective Scheid played no part in the illegal interception and "inadvertently" walked in and heard that conversation on the police scanner. Tr. pp. 43–44. However, the trial court granted the motion with regard to any conversations heard by Scheid after that initial conversation during the two hours Scheid remained in Carey's residence listening to the illegally intercepted communications. *Id.*

Also at trial, Timothy's mother, Bertha Shelton ("Shelton"), testified that on the

evening of November 9, 2001, Timothy and Kimberly had dinner at her house, and Timothy remained at her home until approximately 8:00 p.m. Tr. p. 210. During cross-examination the State asked Shelton if the events that took place on November 9 "could also be corroborated" by Kimberly. Tr. p. 221. Timothy objected and moved for a mistrial because Kimberly, who was also facing criminal charges, could not be compelled to testify because of her Fifth Amendment privilege against self-incrimination. Tr. p. 222. The trial court denied the motion.

The jury found Timothy guilty of both attempted murder and aggravated battery. The trial court vacated Timothy's aggravated battery conviction and sentenced him to serve fifty years executed for his attempted murder conviction. Timothy now appeals. Additional facts will be provided as necessary.

## I. Motion to Suppress

### A. *Standard of Review*

■ When we review a trial court's ruling on a motion to suppress, we review the record for substantial evidence of probative value to support the trial court's determination. *Willsey v. State,* 698 N.E.2d 784, 789 (Ind.1998). We do not reweigh the evidence or reassess the credibility of witnesses. We resolve conflicting evidence in favor of the trial court and consider any substantial uncontroverted evidence. *Id.* However, where the issue presented on appeal is a question of law, we review the matter de novo. *State v. Moss–Dwyer,* 686 N.E.2d 109, 110 (Ind. 1997).

### B. *The Historical Development of Title III of the Omnibus Crime Control and Safe Streets Act of 1968*

During the prohibition era, law enforcement officers principally relied upon infor-

---

4. The State does not challenge that ruling in this appeal.

mation obtained by wiretaps as the basis for prosecutions. *Berger v. New York*, 388 U.S. 41, 46, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). In 1928, the United States Supreme Court, faced with its first case involving wiretapping, held that where interception of the defendant's telephone line was accomplished without entry into his residence, there was no Fourth Amendment violation. *Id.* at 50–51, 87 S.Ct. 1873 (citing *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928)). Six years later, in 1934, possibly in response to the *Olmstead* decision, Congress passed section 605 of the Communications Act of 1934, which "outlawed the interception without authorization, and the divulging or publishing of the contents of wiretaps." *Id.* at 46, 51, 87 S.Ct. 1873.

Despite the federal law, the use of wiretaps in state law enforcement investigations continued under state statutes, and the constitutionality of New York's statute was challenged in *Berger*. The statute at issue in that case authorized "the issuance of an 'ex parte order for eavesdropping'" if certain specified individuals would swear under oath "'that there is a reasonable ground to believe that evidence of crime may be thus obtained, and particularly describing the person or persons whose communications, conversations or discussions are to be overheard or recorded and the purpose thereof, and ... identifying the particular telephone number or telegraph line involved.'" *Id.* at 54, 87 S.Ct. 1873. The Court determined that the New York statute was overbroad in that issuance of the order did not necessarily require probable cause and thus violated the Fourth Amendment. *Id.* at 63–64, 87 S.Ct. 1873. That same year, in *Katz v. United States*, 389 U.S. 347, 359, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court held that the attachment of a listening and recording device to the outside of a telephone booth constituted a search.

Largely in response to the Court's decisions in *Berger* and *Katz,* "'Congress undertook to draft comprehensive legislation both authorizing the use of evidence obtained by electronic surveillance on specified conditions, and prohibiting its use otherwise.'" *Bartnicki et al. v. Vopper et al.,* 532 U.S. 514, 523, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) (quoting *Gelbard v. United States,* 408 U.S. 41, 78, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) (Rehnquist, J., dissenting)). As a result of those efforts, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See* 18 U.S.C. §§ 2510–2520 (2000).

### C. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III")

 Title III regulates electronic surveillance by both law enforcement officers and private citizens. The purposes of Title III are to protect the privacy of wire and oral communications and to delineate "on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." *Gelbard,* 408 U.S. at 48, 92 S.Ct. 2357. Under Title III, all interceptions of wire and oral communications are prohibited unless the interception is authorized. 18 U.S.C. § 2511 (2000). Law enforcement officials investigating specified serious crimes must seek authorization for such interception, which requires prior judicial approval that may not be given absent compliance with certain stringent conditions. *Gelbard,* 408 U.S. at 46, 92 S.Ct. 2357. A communication intercepted as authorized pursuant to Title III may be disclosed and used under certain circumstances; however, unauthorized interceptions and the disclosure or use of the information obtained are crimes, and the victim of such interception and/or disclosure is entitled to recover civil damages.

*Id.* (citing 18 U.S.C. §§ 2511, 2517, 2520). Information obtained during an illegal interception may not be used as evidence in judicial proceedings, and Title III provides procedures for suppression of such evidence in those proceedings. *Id.* (citing 18 U.S.C. §§ 2515, 2518).

Section 2515, the exclusionary rule of Title III, provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter [*18 USCS §§ 2510* et seq.].

18 U.S.C. § 2515 (2000). While Title III does authorize invasions of privacy under limited circumstances, "protection of privacy was an overriding congressional concern," and the congressional findings clearly articulate "the intent to utilize the limitations imposed by Title III upon wiretapping and electronic surveillance." *Gelbard*, 408 U.S. at 48–49, 92 S.Ct. 2357. The congressional findings addressing the provisions of section 2515 provide:

> "In order to protect effectively the privacy of wire and oral communications, to protect the integrity of court and administrative proceedings, and to prevent the obstruction of interstate commerce, it is necessary for Congress to define on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized, to prohibit any unauthorized interception of such communications, and *the use of the contents thereof in*
> *evidence in courts and administrative proceedings."*

*Id.* (quoting § 801(b), 82 Stat. 211) (emphasis added).

### D. *The "Clean Hands" Exception*

In *United States v. Vest*, 813 F.2d 477 (1st Cir.1987), Jesse James Waters was charged with the shooting of Boston Police Detective Francis Tarantino. *Id.* at 478. Tarantino and Vest, also a Boston police detective, reached an agreement with Waters whereby Waters agreed to pay $300,000 to Tarantino in exchange for Tarantino's efforts to assure that Waters would not be sentenced to a term of imprisonment if he pled guilty to the charges pending against him. *Id.* Vest later met with Waters, and as was previously arranged, Waters gave Vest $35,000 for Tarantino. Waters recorded the transaction and ensuing discussion without Vest's knowledge. *Id.* During an investigation of the payoff scheme, Vest testified before a grand jury that he had not participated in Waters' payment of money to Tarantino. *Id.* Vest was then charged with making false declarations before a grand jury. *Id.*

The district court suppressed Waters' tape recording, which the government sought to enter into evidence. *Id.* The district court found the tape recording should be excluded because it was made in violation of Title III; therefore, under section 2515, the government was prohibited from using the tape in its case-in-chief. *Id.* at 479–80. On appeal the government argued that "the exclusionary rule of section 2515 is inapplicable where the government is merely the innocent recipient, rather than the procurer, of an illegally intercepted communication." *Id.* at 480. Specifically, the government contended that the purpose of section 2515 is to deter violations of the other provisions of Title III, and section 2515 should not be applied

against the government where it played no part in the illegal interception. *Id.*

The First Circuit determined that "the government's characterization of section 2515 as solely aimed at deterring" violations of Title III "is too narrow." *Id.* at 480–81. The court noted that

> an invasion of privacy is not over when an interception occurs, but is compounded by disclosure in court or elsewhere. The impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted by the guilty interceptor[.]

*Id.* at 481. The court also observed that as discussed by the Supreme Court in *Gelbard*, Congress' overriding concern in enacting Title III was the protection of privacy and "section 2515's 'importance as a protection for the victim of an unlawful invasion of privacy could not be more clear.'" *Id.* (citing *Gelbard*, 408 U.S. at 50, 92 S.Ct. 2357).

The government also argued that the court should interpret section 2515 to include the exception to the Fourth Amendment exclusionary rule for evidence obtained by the government after a private search and seizure. *Id.* (citing *United States v. Jacobsen*, 466 U.S. 109, 113–18, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). The

court disagreed and stated, "the fourth amendment exclusionary rule is a judicially-fashioned rule serving different purposes than the congressionally-created rule of section 2515—a rule that we are here limited to interpreting rather than modifying." *Id.* Further, the court agreed with the district court that to find that section 2515 permits the government to use unlawfully intercepted communications where the government was the innocent recipient of those communications "'would eviscerate the statutory protection of privacy from intrusion by illegal private reception.'" *Id.* (citing *United States v. Vest*, 639 F.Supp. 899, 914–15 (D.Mass. 1986)).[5]

The Sixth Circuit reached the opposite conclusion and recognized a "clean hands" exception to section 2515 in *United States v. Murdock*, 63 F.3d 1391 (6th Cir.1995), *cert. denied.* In that case, Murdock's wife taped his telephone conversations without his knowledge, and in one of those conversations Murdock discussed engaging in an act of bribery. *Id.* at 1392–93. Murdock was eventually indicted for income tax evasion because the bribe was not reported as income. *Id.* at 1393. Murdock moved to suppress the taped conversation pursuant to the exclusionary provisions in section 2515. *Id.* The district court denied the motion in part because it found that the

---

**5.** However, we observe that prior to *Vest*, the First Circuit recognized an exception to the section 2515 exclusionary rule, which allowed illegally intercepted communications to be used for impeachment purposes in limited circumstances. *Vest*, 813 F.2d at 484 (citing *United States v. Winter*, 663 F.2d 1120, 1124 (1st Cir.1981), *cert. denied* ). Several other circuits have also adopted this exception to section 2515. *See e.g. United States v. Baftiri*, 263 F.3d 856, 858 (8th Cir.2001); *United States v. Wuliger*, 981 F.2d 1497, 1506 (6th Cir.1992), *cert. denied; United States v. Echavarria–Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990), *cert. denied; Jacks v. Duckworth*, 651

F.2d 480, 484 (7th Cir.1981), *cert. denied; United States v. Caron*, 474 F.2d 506, 508 (5th Cir.1973). In doing so, those courts generally rely on the legislative history of Title III, which provides that "Congress did not intend to 'press the scope of the suppression [rule] beyond ... search and seizure law. *Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954).'" *Baftiri*, 263 F.3d at 857 (citation omitted). Congress' citation to *Walder* is significant because the Supreme Court established the impeachment exception to the Fourth Amendment exclusionary rule in that decision. *Walder*, 347 U.S. at 65, 74 S.Ct. 354.

"statutory exclusion provisions of Section 2515 did not apply to the government where it played no part in the interception of the conversation." *Id.*

On appeal, Murdock relied on the First Circuit's decision in *Vest* to support his argument that the tape should be suppressed. *Id.* at 1400. In resolving this issue, the court discussed the First Circuit's reliance on legislative history discussed in *Gelbard,* and its conclusion that *Gelbard* stands for the proposition that "any and all illegally intercepted evidence must be suppressed in order to protect the victim's privacy." *Id.* at 1401. However, the court concluded that the First Circuit's reading of *Gelbard* was too broad, and observed that unlike the facts in *Vest* and *Murdock,* in *Gelbard* the witness, who was challenging a finding of civil contempt for his refusal to testify before a grand jury, was asserting that the government itself had engaged in illegal wiretapping and electronic surveillance. *Id.* The court then stated:

> [t]he Gelbard Court's discussion of the legislative history of Section 2515, read in context of the facts of the case, emphasized not that individuals are just generally entitled to have their privacy protected, but that they are specifically entitled to protection from unscrupulous law enforcement procedures which invade their privacy. The point of Gelbard was that if the government was eventually shown to have illegally intercepted the conversations, then the witness was entitled under Title III to have that evidence suppressed and completely excluded from any line of questioning in any proceeding, including a grand jury proceeding. To cite Gelbard as standing for the proposition that the entire purpose of Title III is to prevent victimiza-

tion in the form of invasion of privacy goes too far.

*Id.*

Unlike the *Vest* court, the *Murdock* court then determined that Fourth Amendment law was applicable in resolving the issue because the issue involved a factual situation not contemplated by the statute. *Id.* at 1402. In reaching this conclusion, the court relied on the legislative history of section 2515, which provided that section 2515 "was not intended 'generally to press the scope of the suppression role beyond present search and seizure law.'" *Id.* (citing S.Rep. No. 1097, 90th Cong., 2d Sess., 96 (1968)). The court also observed that to suppress the evidence when the government did not play a role in its illegal interception would have no deterrent effect on the future conduct of law enforcement officials. *Id.* "In the usual fourth amendment calculus, these are factors that counsel against the necessity of suppression." *Id.* Noting the well established principle that evidence obtained by a private search is not subject to the Fourth Amendment exclusionary rule and concluding that "there is nothing in the legislative history which requires that the government be precluded from using evidence that literally falls into its hands," the court held that it is appropriate to apply a "clean hands" exception to section 2515. *Id.* at 1403–04.

Only the Third, Ninth, and D.C. Circuit Courts of Appeals have since addressed this issue, and all have refused to follow the *Murdock* court's application of the "clean hands" exception. In *In re: Grand Jury,* 111 F.3d 1066 (3rd Cir.1997), the Third Circuit determined that there was no "indication that Congress intended the clean hands exception" to apply to section 2515. *Id.* at 1078.

The government cites a statement in the legislative history, to the effect that "the

perpetrator must be denied the fruits of his unlawful actions in civil and criminal proceedings," to support its contention that Congress did not intend to deprive the government of the use of unlawful evidence when the government is not the "perpetrator" of the illegal interception. But this statement evidences no intent that a non-perpetrator may use the fruits of another's unlawful actions. To the contrary, the statute and its legislative history provide that anyone who discloses the contents of a communication knowing it to be the fruit of an illegal invasion of privacy is guilty of a criminal offense, and likewise § 2515's evidentiary prohibition must be applied to perpetrators and non-perpetrators alike.

*Id.* (internal citations omitted). The court concluded, "it is incomprehensible that Congress intended the admissibility of unlawfully intercepted communications to turn solely on whether the government participated in the interceptions." *Id.*

In *Chandler v. United States Army et al.*, 125 F.3d 1296 (9th Cir.1997), the Ninth Circuit disagreed with the *Murdock* court for the following reasons: 1) "the purpose of the statute is to prevent private, not just governmental wiretapping" and 2) "we cannot reconcile the Sixth Circuit reading with the statutory language." *Id.* at 1302. In *Berry v. Funk et al.*, 146 F.3d 1003 (D.C.Cir.1998) the D.C. Circuit agreed with the *Chandler* court's rejection of *Murdock* on the grounds that the *Murdock* court's interpretation of section 2515 "relied only on policy notions rather than the language of the statute in accepting the government's 'clean hands' argument." *Id.* at 1013.

E. *Analysis*

The State argues that we should follow the reasoning of the *Murdock* court and adopt the "clean hands" exception because the "suppression of evidence would have no deterrent effect on law enforcement in a situation where law enforcement was not involved in a private individual's decision to intercept or record telephone conversations." Br. of Appellee at 8. The State also contends if the "clean hands" exception is adopted, under Title III the privacy interests at issue are still protected by criminal and civil penalties. Timothy argues that when it enacted Title III, Congress' foremost concern was the protection of privacy and to protect that interest, suppression is required when a communication is intercepted in violation of Title III.

■■■ As we noted above, Congress' primary concern when it passed Title III was the protection of privacy and section 2515's "importance as a protection for 'the victim of an unlawful invasion of privacy' could not be more clear." *Vest*, 813 F.2d at 481 (quoting *Gelbard*, 408 U.S. at 50, 92 S.Ct. 2357). In contrast, the primary purpose of the Fourth Amendment exclusionary rule "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Therefore, while we agree with the State that suppression of the evidence in this case would have no deterrent effect on future police conduct, Congress' dominant concern when enacting Title III was not deterrence of unlawful police conduct, but rather, protection of the privacy of communication.

■■ The objective of Title III is to shield an individual's private communications from disclosure, regardless of whether a private party or the government intercepts the communication. *Vest*, 813 F.2d at 481 (quoting *United States v.*

*Giordano,* 416 U.S. 505, 528, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) ("The protection of privacy from invasion by illegal private interception as well as unauthorized governmental interception plainly 'play[s] a central role in the statutory scheme.' "). Furthermore, "an invasion of privacy is not over when an interception occurs, but is compounded by disclosure in court or elsewhere." *Id.* (citing *Gelbard,* 408 U.S. at 51–52, 92 S.Ct. 2357).

In addition, the language of section 2515 is unambiguous: "[w]henever *any* wire or oral communication has been intercepted, *no part of the contents* of such communication *and no evidence derived* therefrom *may be received in evidence* in any trial, hearing, or other proceeding in or before any court, ... if the disclosure of that information would be in violation of" Title III (emphasis added). The literal application of section 2515, which requires the exclusion of illegally intercepted communications from being admitted into evidence in court proceedings, is consistent with the intent of Title III, protection of privacy. The Seventh Circuit has observed that although Title III is generally consistent with Fourth Amendment law and "Title III's suppression remedy has its roots in the Fourth Amendment exclusionary rule, it is not simply coextensive with that rule." *United States v. Dorfman,* 690 F.2d 1217, 1227 (7th Cir.1982).

◼ Finally, suppression of evidence of the illegally intercepted telephone call and any evidence derived therefrom is also consistent with the constitutional protections established in Article One, Section Eleven of our Indiana Constitution. " 'The purpose of Article One, Section Eleven is to protect from unreasonable police activity those areas of life that Hoosiers regard as private.' " *Shultz v. State,* 742 N.E.2d 961, 965 (Ind.Ct.App.2001), *trans. denied* (quoting *Brown v. State,* 653 N.E.2d 77, 79

(Ind.1995)). Telephone conversations are clearly just such an area of private life for Hoosiers. *See* Ind.Code §§ 35–33.5–1–1 through 35–33.5–5–6 (1998).

◼ In light of the legislative history, the unambiguous language of section 2515, and Article One, Section Eleven of the Indiana Constitution, we decline to adopt the "clean hands" exception with respect to section 2515. We agree with the *Vest* court that allowing the government to use an illegally intercepted communication where it played no part in the interception "would eviscerate the statutory protection of privacy from intrusion by illegal private interception." *Vest,* 813 F.2d at 481. Therefore, pursuant to section 2515, the contents of the illegally intercepted telephone call and any evidence derived therefrom should have been excluded from the court proceedings, and the trial court abused its discretion when it denied Timothy's motion to suppress.

## II. Harmless Error

◼ However, the State argues that admission of the evidence of the telephone call constitutes harmless error: "Evidence admitted in error may not require reversal if the error is found to be harmless." *Overstreet v. State,* 783 N.E.2d 1140, 1156 (Ind.2003). Error in the admission of evidence is harmless "when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction." *Bocko v. State,* 769 N.E.2d 658, 665 (Ind.Ct.App.2002), *trans. denied.*

While we agree with Timothy's argument that the erroneously admitted evidence of the telephone conversation was incriminating, we conclude that the State presented substantial independent evidence of Timothy's guilt. Roberts consistently identified Timothy as the individual

who stabbed her. The State presented evidence that after Roberts was stabbed, Timothy left messages on Roberts' roommates' voice mail stating "[s]tay out of this, this is between me and Wesla" and "I don't play games, as you now know." Tr. pp. 188–89. Also, Terry Thomas, the father of one of Timothy's friends, testified that during a telephone conversation, Timothy told Thomas that he "had cut his girlfriend's throat."[6] Tr. p. 143. In light of this evidence, we conclude that the admission of the evidence of the telephone call was harmless and did not affect Timothy's substantial rights.

### III. Mistrial

■■■■■ Timothy argues that the trial court abused its discretion when it denied his motion for a mistrial.

A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation. The determination of whether to grant a mistrial is within the trial court's discretion, and we will reverse only for an abuse of that discretion. An abuse of discretion has occurred if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. We accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury. When determining whether a mistrial is warranted, we must consider whether the defendant was placed in a position of grave peril to which he should not have been subjected. The gravity of the peril is determined by the probable persuasive effect of the matter complained of on the jury's decision.

*Kirby v. State*, 774 N.E.2d 523, 533–34 (Ind.Ct.App.2002), *trans. denied* (internal citations omitted).

At trial, Timothy argued that on the date and at the time of the attack on Roberts, he and Kimberly were at Shelton's house having dinner. During the State's cross-examination of Shelton, the State asked Shelton if the events that took place on November 9th "could also be corroborated" by his sister, Kimberly. Tr. p. 221. Timothy immediately objected and moved for a mistrial. Kimberly was unavailable to testify because if called to testify, she would have invoked her Fifth Amendment privilege due to the charges pending against her for assisting Timothy when he was hiding from the police.[7] On appeal, he argues that the trial court abused its discretion when it denied his motion because the State's question to Shelton "left the jury with the distinct impression that the reason Timothy Henson's sister was not testifying on his behalf was not because she was unavailable due to a Fifth Amendment privilege, but rather that her testimony would be contrary to [Shelton's] and therefore not in the best interests of [Timothy]." Br. of Appellant at 17.

In *Jenkins v. State*, 695 N.E.2d 158, 160 (Ind.Ct.App.1998), during closing arguments, the prosecutor commented on the defendant's inability to present an alibi

---

6. In his reply brief, Timothy states that Terry Thomas was "a dubious witness" because of his two prior felony theft convictions. Reply Br. at 5. However, we note that we will not reweigh the credibility of witnesses on appeal. *See Thompson v. State*, 728 N.E.2d 155, 159 (Ind.2000).

7. As we stated above, Kimberly is charged with assisting a criminal, as a Class C felony, and her interlocutory appeal challenging the trial court's denial of her motion to suppress evidence of the November 27, 2001, telephone call is also decided today in a memorandum decision by this panel. *See Kimberly Henson v. State*, No. 49A02–0209–CR–0774 (Ind. Ct. App. June 23, 2003).

witness. The defendant moved for a mistrial arguing that the comment impermissibly shifted the burden of proof to the defendant. *Id.* On appeal, our court determined that a mistrial was not warranted because the jury was admonished and adequately instructed with regard to the State's burden of proof, the presumption of innocence, and that the defendant is not required to present any evidence. *Id.* at 161; *see also Chubb v. State,* 640 N.E.2d 44, 48–49 (Ind.1994); *Pettiford v. State,* 506 N.E.2d 1088, 1089–90 (Ind.1987).

In this case, Timothy argues that the prosecutor's question concerning Kimberly's ability to corroborate Shelton's testimony cast doubt on Shelton's credibility, which subjected Timothy to grave peril because Shelton was his only alibi witness. Initially, we note that the trial court ordered that question to be stricken from the record and instructed the jury that they could not consider any matter so stricken during their deliberations. Tr. p. 226. Furthermore, the trial court admonished the jury stating that "they did not hear any testimony from the Defendant's sister, Kimberly Henson, due to her being unavailable as a witness in this matter." Tr. p. 247. Similar to the courts in *Jenkins, Chubb,* and *Pettiford,* the trial court properly instructed the jury regarding the State's burden of proof, the presumption of innocence, and that the defendant is not required to present any evidence. Also, the jury was properly instructed that they should "attempt to fit the evidence to the presumption that the defendant is innocent and the theory that every witness is telling the truth." Appellant's App. p. 110. In light of the trial court's admonishments and instructions to the jury, Timothy has failed to establish that he was placed in a position of grave peril by the prosecutor's statement. Therefore, the trial court did not abuse its discretion when it denied Timothy's motion for a mistrial.

## Conclusion

Even though the government played no part in intercepting the telephone call at issue in this case, the telephone call was illegally intercepted, and there is no "clean hands" exception under 18 U.S.C. § 2515. Therefore, the evidence of the telephone call should have been suppressed. However, although the trial court abused its discretion when it denied Timothy's motion to suppress, admission of that evidence constitutes harmless error given the substantial independent evidence of Timothy's guilt. Also, the trial court did not abuse its discretion when it denied Timothy's motion for a mistrial.

Affirmed.

KIRSCH and MATTINGLY–MAY, JJ., concur.