# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 22 2020, 10:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kevin Wild
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nikolas S. Shannon, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 22, 2020 <br><br> Court of Appeals Case No. 19A-CR-1747 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Ruth D. Reichard, Senior Judge <br><br> Trial Court Cause No. 49G03-1711-MR-46360 |

**Najam, Judge.**

# Statement of the Case

Nikolas Shannon appeals his convictions for murder, a felony, and robbery, as a Level 5 felony, following a jury trial. Shannon presents four issues for our review, which we revise and restate as follows:

1. Whether the trial court erred under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 when it allowed a witness to testify.

2. Whether the trial court abused its discretion when it admitted certain photographs as evidence.

3. Whether the trial court abused its discretion when it declined to instruct the jury on reckless homicide.

4. Whether the State presented sufficient evidence to support his convictions.

We affirm.

# Facts and Procedural History

On November 12, 2017, Jared Dowell picked up Darious Carson, and the two went to Shannon's apartment complex so that Dowell could buy marijuana from Stefon McClendon, who is Shannon's cousin. When they got there, Dowell backed his car into a parking space. Shortly thereafter, McClendon and his girlfriend, Vinettie Palmer, arrived, and McClendon parked his car near Dowell's. Palmer then went into Shannon's apartment. Also in the apartment were Shannon and his sister. While Palmer was in the apartment, McClendon got into the rear passenger side seat of Dowell's car. McClendon and Dowell

then began to argue about ten dollars that Dowell owed to McClendon. Dowell was "nonchalant" and "joking," but McClendon was "angry" and felt "disrespected." Tr. Vol. II at 191. McClendon tried to get Dowell to fight him, but Dowell refused. Dowell then paid McClendon $600 in exchange for one-quarter pound of marijuana.

[4] Following the transaction, Dowell asked McClendon for a cigar that he could use to smoke some of the marijuana. McClendon agreed, and he exited the car and went into Shannon's apartment. When he entered the apartment, Palmer noticed that McClendon was "irritated." Tr. Vol. III at 174. Palmer then overheard a conversation between McClendon and Shannon, during which Palmer believed that McClendon told Shannon that he did not "get what he wanted" from Dowell. *Id*. at 178. Following that conversation, Shannon changed into black clothes, and he used "a black item" to "hid[e] a portion of his face."[1] *Id*. at 215. Shannon then left the apartment through the back door, and McClendon left through the front door.

[5] Approximately five minutes after McClendon had exited the car, Carson saw a man dressed in a black hoodie and a black mask walk toward him. The man walked to the driver's side window and asked Dowell for a cigarette. Dowell complied, and the man stepped behind the car to smoke it. McClendon then returned to Dowell's car and got into the rear passenger side seat. At the same

---

[1] Palmer initially referred to the face covering as a "mask." *Id*. at 175. However, she later referred to it as a "bandanna." *Id*. at 183.

time, the man in the mask opened the rear driver side door, pointed the gun at Dowell, and asked: "[h]ave you ever been robbed before." Tr. Vol. II at 196. The man hit Dowell in the face with a pistol and reached his hand toward Dowell's left pocket in order to grab the marijuana and "anything else" he could get. *Id.* at 197. During the struggle, the man's mask was "pulled down," and Carson observed that the man had "gold teeth." *Id.* at 198. "[A]ll of the sudden," Dowell put the car in drive, and the car "t[ook] off." *Id.* at 197. The man in the mask "fell," and the gun "went off," hitting Dowell in the back. *Id.* at 198. Carson grabbed the steering wheel and pulled the car onto the curb. At that point, Carson called 9-1-1, and he saw the man in the mask run toward Shannon's apartment.

[6] A "couple of minutes" after Shannon and McClendon had left Shannon's apartment, Shannon reentered through the back door. Tr. Vol. III at 183. Shannon told Palmer that he "had to shoot him because he was going to ride off with" McClendon, who was still sitting in the back seat of the car. *Id.* at 184. Shannon then changed out of his clothes and told his sister and Palmer to go to a back room.

[7] Officer Keith Hartman with the Indianapolis Metropolitan Police Department ("IMPD") heard the 9-1-1 call come over the radio. Officer Hartman was approximately 250 yards from the location, so he volunteered to respond. "Less than thirty seconds" after he had heard the call, Officer Hartman arrived at the scene, and he saw a car stopped on the curb. Tr. Vol. II at 140. He then watched two men exit the car, and he saw that Dowell was still in the car with

his seat belt on, his hands on the wheel, and his head back against the headrest. Officer Hartman checked Dowell for wounds but did not see any, so he administered Narcan. Dowell did not respond, so officers removed Dowell from the car and discovered the gunshot wound to his back. Medics determined that Dowell was deceased.

[8] Officers then obtained and reviewed security footage from the apartment complex. On that footage, officers observed the suspect open the rear driver's side door and start to "assault" Dowell. Tr. Vol. III at 139. Officers were also able to see that, as the car started to drive off, the suspect ran toward Shannon's apartment. Based on that footage, IMPD Officer Paul Humphrey went to the rear of Shannon's apartment. Officer Humphrey was able to see into the apartment through a glass door, and he observed marijuana on a table. Officer Humphrey then saw Shannon in the apartment, the two made eye contact with each other, and Shannon "slammed" the blinds shut. Tr. Vol. II at 168. Officer Humphrey believed that Shannon was going to exit the apartment through the front door, so he went around to the front. As he got there, Shannon opened the door, saw Officer Humphrey, and shut the door "very quickly." *Id.* Officer Humphrey then knocked on the door, but Shannon did not respond.

[9] Officers set up a perimeter around Shannon's apartment. Approximately forty-five minutes later, Palmer and Shannon's sister exited. Thirty minutes after that, Shannon left his apartment. At that point, officers arrested Shannon and searched his apartment. During the search of the apartment, a crime scene

specialist discovered a 9-millimeter pistol with an empty magazine inside the bag of a vacuum cleaner.

[10] Officers also found the following items in Shannon's apartment: a gun holster and magazine with ten 9-millimeter cartridges in a wall vent, five fired cartridges on his patio, two fired cartridges in a kitchen trashcan, a plastic bag with "residue" from "green vegetation" in the trashcan, remnants of what appeared to be marijuana in a toilet, and a gold mouthpiece. Tr. Vol. III at 43. Officers also searched Dowell's vehicle. There, officers found a fired 9-millimeter cartridge in the "crevice between where the windshield meets the trunk of the car." *Id*. at 58.

[11] Meanwhile, officers escorted Palmer to the police station where they questioned her. Palmer told the officers that Shannon had not left his apartment that day. Later, Palmer used her mother's cell phone to make a phone call. Unbeknownst to Palmer, her mother had an application on her phone that automatically records every call. Palmer's mother overheard Palmer make statements about the offense, so Palmer's mother provided a copy of the recorded call to the police. Based on the content of that recording, the State charged Palmer with two counts of assisting a criminal. Thereafter, in September 2018, Palmer gave another statement to police. In that statement, Palmer recanted her earlier statement and informed the police of Shannon's involvement in the offense.

[12] The State charged Shannon with murder, a felony; felony murder, a felony; and robbery, as a Level 2 felony. Prior to his trial, Shannon filed a motion to exclude the contents of Palmer's phone call and any testimony from Palmer that was different than the statement she had given to police on the day of the offense. Specifically, Shannon asserted that Palmer had only changed her statement because the State had filed charges against her, which charges the State filed based on the content of the phone call that Palmer's mother had recorded without Palmer's knowledge or consent. Shannon maintained that Palmer's revised statement, which implicated Shannon in the offense, was evidence "derivatively related" to the contents of an illegally recorded phone call. Appellant's App. Vol. II at 113. Accordingly, Shannon asserted that it was a violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 for the State to present Palmer's changed testimony as evidence. Following a hearing, the trial court concluded that the State could not introduce the recorded phone call as evidence, but the court did not issue a ruling as to Palmer's changed testimony.

[13] During Shannon's jury trial, the State called Samantha Kistner, a crime scene specialist who had searched Shannon's apartment, as a witness. Kistner testified about the items she and the officers had found in Shannon's apartment. At that point, Shannon objected to the admission of any evidence that depicted or referenced the fired cartridges that officers had found on Shannon's patio and in the kitchen trashcan on the ground that those photographs were irrelevant. Specifically, Shannon asserted that there was no "direct correlation" between

those fired cartridges and the offense. Tr. Vol. III at 21. Shannon also asserted that the prejudicial impact of those photographs substantially outweighed their probative value. The State responded and asserted that the fired cartridges were relevant because the fired cartridges were the same caliber as the bullet that had struck Dowell and, as such, the cartridges connected Shannon to the murder weapon. The court noted that it was a "slim call" but found that the probative value outweighed the prejudicial impact and overruled Shannon's objection. *Id.* at 30.

[14] The State then indicated that it intended to call Palmer as a witness, and Shannon again asked the court to exclude any testimony that differed from her original statement to police on the ground that that change in testimony was derived from an illegally recorded phone call. During a hearing outside the presence of the jury, Palmer then testified that, while the criminal charges against her "influenced" her decision, she decided to tell police what she had actually witnessed on the day of the offense because she had learned that Dowell, who was her friend, was the person who had been killed; her mother had encouraged her to cooperate; her attorney advised her to give a truthful statement; she was no longer in a relationship with McClendon; and she was pregnant *Id.* at 111. The court concluded that Palmer's statement was not derivative of the recorded phone call and denied Shannon's motion to exclude that evidence. Palmer then testified in a manner that was consistent with her revised statement to police.

[15]   The State also called Shelly Crispin, the DNA technical leader at the Indianapolis Marion County Forensic Services Agency ("Crime Lab"), as a witness. Crispin testified that the DNA from the gold mouthpiece found in Shannon's apartment matched Shannon's DNA. Douglas Boxler, a firearms examiner with the Crime Lab, then testified that he had analyzed both the bullet recovered from Dowell's body and the fired cartridge recovered from Dowell's car, and he concluded that they had both been fired by the pistol found in Shannon's apartment.

[16]   After both parties had rested, Shannon requested that the court instruct the jury on reckless homicide as a lesser included offense to murder. Shannon asserted that the evidence demonstrated that, as the car drove off, "it was more or less a stumble and the gun shot off[.]" Tr. Vol. IV at 106. The State responded that Shannon's actions before the offense and his statement to Palmer after the offense demonstrated that Shannon had knowingly or intentionally killed Dowell. The court agreed with the State and declined to give Shannon's proffered jury instruction.

[17]   During deliberations, the jury informed the trial court that it was "having a struggle" with the "knowingly" element of the murder charge, so it asked the court the following question: "If I juggle flaming objects in my home and accidentally set fire to the house, did I knowingly set fire to the house?" *Id*. at 181. Based on that question, Shannon again asked the court to instruct the jury on reckless homicide. The court denied Shannon's request.

The jury found Shannon guilty as charged.  Due to double jeopardy concerns, the court only entered judgment of conviction for murder, a felony, and robbery, as a Level 5 felony.  The court then sentenced Shannon to an aggregate term of fifty years in the Department of Correction.  This appeal ensued.

## Discussion and Decision

### *Issue One:  Admission of Palmer's Testimony*

Shannon first asserts that the trial court erred when it admitted Palmer's changed testimony, which implicated Shannon in the offense, as evidence.  As our Supreme Court has stated:

> Generally, a trial court's ruling on the admission of evidence is accorded a great deal of deference on appeal.  Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion and only reverse if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015) (internal quotation marks and citations omitted).  However, where the issue presented on appeal is a question of law, we review the matter *de novo*.  *Henson v. State*, 790 N.E.2d 524, 528 (Ind. Ct. App. 2003).

Shannon contends that the trial court erred when it admitted Palmer's testimony because that testimony violated Title III of the Omnibus Crime

Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 to § 2523 ("Title III").

In *Henson*, which applied Title III in Indiana, this Court explained that Title III

> regulates electronic surveillance by both law enforcement officers and private citizens. The purposes of Title III are to protect the privacy of wire and oral communications and to delineate "on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." *Gelbrad* [*v. United States*], 408 U.S. [41,] 48, 92 S.Ct. 2357. Under Title III, all interceptions of wire and oral communications are prohibited unless the interception is authorized.

790 N.E.2d at 529. Further, when "information is obtained in violation of [Title III], 'no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial.'" *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (quoting 18 U.S.C. § 2515).

[21] On appeal, Shannon contends that Palmer only changed her statement and implicated him in the offense after the State had charged her with a crime. And Shannon contends that the State only charged Palmer with a crime based on the content of the phone call that Palmer's mother had recorded without Palmer's knowledge or consent. Accordingly, Shannon asserts that Palmer's testimony against him was "evidence derived from" an "illegally intercepted phone call" in violation of Title III and was, therefore, inadmissible at his trial. Appellant's Br. at 16.

[22] However, we agree with the State that Shannon lacked standing to challenge the admission of any evidence derived from the recorded phone call. Only "an

'aggrieved person' may move to suppress the contents of a wire or oral communication intercepted in violation of" Title III. *Alderman v. United States*, 394 U.S. 165, 175 n.9 (1969); *see also Faulkner*, 439 F.3d at 1223. Indeed, 18 U.S.C. Section 2518(10)(a)(1) provides that "[a]ny aggrieved person in any trial . . . may move to suppress the contents of any wire or oral communication intercepted" in violation of Title III on the ground that "the communication was unlawfully intercepted." And an "aggrieved person" is defined as "a person who was a party to an intercepted wire, oral, or electronic communication or a person against whom the interception was directed[.]" 18 U.S.C. § 2518(10).

Here, there is no dispute that Shannon was not a party to the intercepted phone call. Further, Palmer's mother installed the application on her own phone in order to automatically record any phone call that she makes or receives. There is no indication in the record that Palmer's mother downloaded the application in an attempt to record any conversation that would contain information that implicated Shannon in an offense. Accordingly, the evidence demonstrates that Shannon was not the target of the interception.

Because Shannon was neither a party to the recorded phone call nor the target of the interception, Shannon is not an aggrieved party under Title III. *See* 18 U.S.C. § 2518(11). As such, Shannon lacked standing to seek the suppression of the contents of Palmer's phone call or any evidence derived therefrom. *See Faulkner*, 439 F.3d at 1223. The trial court therefore did not err when it admitted Palmer's testimony implicating Shannon in the offense.

### *Issue Two: Admission of Photographs*

[25]     Shannon next contends that the trial court abused its discretion when it admitted as evidence photographs of the fired cartridges that officers had found on his patio and in his kitchen trashcan. As discussed above, we review a trial court's ruling on the admission of evidence for an abuse of discretion, and we will only reverse if the ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *See Hall*, 36 N.E.3d at 466. Here, Shannon specifically asserts that the trial court abused its discretion when it admitted the photographs of the fired cartridges because those photographs were irrelevant and prejudicial.

[26]     Indiana Evidence Rule 401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence." Indeed, our Supreme Court has explained that "[e]vidence is relevant when it has any tendency to prove or disprove a consequential fact. This liberal standard for relevancy sets a low bar, and the trial court enjoys wide discretion in deciding whether that bar is cleared." *Snow v. State*, 77 N.E.3d 173, 177 (Ind. 2017) (quotation marks and citations omitted). However, even if evidence is relevant, a court may exclude it "if its probative value is substantially outweighed by a danger of" unfair prejudice. Ind. Evidence Rule 403.

[27]     On appeal, Shannon contends that the photographs of the fired cartridges were irrelevant because "there was no evidence whatsoever of when or how they got [to] where they were found, who put them there, how long they had been there,

where they came from, where they had been fired, whether they have even been fired[,] . . . or why they were there[.]" Appellant's Br. at 23. Accordingly, he maintains that there was "simply nothing to make any sense or relevance of the casings, and consequently virtually no probative value" to them. *Id*. at 24. In the alternative, he asserts that, even if the photographs were relevant, the probative value was substantially outweighed by the danger of unfair prejudice because there was "certainly the danger that [the jury] would see casings lying all over and be persuaded, on an improper basis, that Mr. Shannon shoots guns often and therefore must be the shooter in this case." *Id*. at 25.

[28]     However, we need not decide whether the trial court erred when it admitted the photographs of the fired cartridges because any error in the admission of that evidence was harmless. It is well settled "that a claim of error in the admission or exclusion of evidence will not prevail on appeal 'unless a substantial right of the party is affected.'" *Troutner v. State*, 951 N.E.2d 603, 612 (Ind. Ct. App. 2011) (quoting *Pruitt v. State*, 834 N.E.2d 90, 117 (Ind. 2005)), *trans. denied*. That is, "even if the trial court errs in admitting or excluding evidence, this Court will not reverse the defendant's conviction if the error is harmless." *Caesar v. State*, 139 N.E.3d 289, 292 (Ind. Ct. App. 2020), *trans. denied*. An error in the admission of evidence is harmless where the "probable impact" of the erroneously admitted evidence, "in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial right" of the defendant. Ind. Appellate Rule 66(A).

[29]     Here, the evidence demonstrates that, following a conversation with McClendon during which McClendon told Shannon that he did not "get what he wanted" from Dowell, Shannon changed into all black clothes and used a mask to hide a portion of his face. Tr. Vol. III at 178, 215. Shannon then exited his apartment.

[30]     The evidence further demonstrates that, a few minutes after McClendon had exited Dowell's car, a man dressed in a black hoodie and black mask approached the car, opened the rear passenger side door, pointed a gun at Dowell, and asked: "[h]ave you ever been robbed before." Tr. Vol. II at 196. At that point, the man in the mask hit Dowell in the face with a gun and reached down to grab the marijuana. During that struggle, the man's mask was pulled down, and Carson observed that the assailant had "gold teeth." *Id*. at 198. Dowell then suddenly put the car in drive, at which point the man in the mask stumbled and shot Dowell in the back, killing him. Carson then observed the assailant run toward Shannon's apartment.

[31]     Further, Palmer testified that, a few minutes after Shannon and McClendon had left the apartment, Shannon returned and told Palmer that he "had to shoot him because he was going to ride off" with McClendon. Tr. Vol. III at 184. In addition, Officer Humphrey testified that, after officers had reviewed the security footage, he approached Shannon's apartment and observed marijuana on the table.

[32] And Kistner testified that, during a search of Shannon's apartment, officers found a 9-millimeter pistol hidden in a vacuum, which a firearms examiner confirmed was used to shoot Dowell. Kistner also testified that she found a gold mouthpiece, which Crispin testified contained Shannon's DNA. Further, Kistner testified that she found a plastic bag with residue from "green vegetation" and the remnants of what appeared to be marijuana in the toilet. *Id*. at 43.

[33] In light of all of the evidence before the court, we can say with confidence that the probable impact of the photographs of the fired cartridges that officers had found in and around Shannon's apartment was sufficiently minor so as not to affect Shannon's substantial rights. *See Caesar*, 139 N.E.3d at 292. Accordingly, we conclude that any error in the court's admission of that evidence was harmless.

### *Issue Three: Jury Instruction*

[34] Shannon also asserts that the trial court abused its discretion when it declined to instruct the jury on reckless homicide as a lesser included offense to murder. "Instructing the jury is a matter within the discretion of the trial court, and we'll reverse only if there's an abuse of discretion." *Cardosi v. State*, 128 N.E.3d 1277, 1284 (Ind. 2019). "[W]e look to whether evidence presented at trial supports the instruction and to whether its substance is covered by other instructions." *Batchelor v. State*, 119 N.E.3d 550, 554 (Ind. 2019).

[35] Further,

[w]hen a defendant requests an instruction covering a lesser-included offense, a trial court applies the three-part analysis set forth in *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995). The first two parts require the trial court to determine whether the offense is either inherently or factually included in the charged offense. *Id*. If so, the trial court must determine whether there is a serious evidentiary dispute regarding any element that distinguishes the two offenses. *Id*. at 567; *see also Brown v. State*, 703 N.E.2d 1010, 1019 (Ind. 1998). *Wright* held that, "if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court to not give an instruction, when requested, on the inherently or factually included lesser offense." *Wright*, 658 N.E.2d at 567. Where a trial court makes such a finding, its rejection of a tendered instruction is reviewed for an abuse of discretion. *Brown*, 703 N.E.2d at 1019.

*Wilson v. State*, 765 N.E.2d 1265, 1271 (Ind. 2002).

[36] Murder is defined as a person who "knowingly or intentionally kills another human being." Ind. Code § 35-42-1-1(1) (2020). And reckless homicide is defined as a person who "recklessly kills another human being." I.C. § 35-42-1-5. The only distinguishing feature in the elements of murder and reckless homicide is the *mens rea* required of each offense. *McDowell v. State*, 102 N.E.3d 924, 931 (Ind. Ct. App. 2018). Reckless homicide is therefore an inherently included offense of murder. *Id*.

[37] On appeal, Shannon asserts that there was a serious evidentiary dispute as to whether he had knowingly or recklessly shot Dowell. Specifically, Shannon contends that Carson's testimony demonstrates that he only shot Dowell when the car "suddenly lurched forward," which caused him to "stumble and fall," at

which point the gun "discharged." Appellant's Br. at 19. Accordingly, Shannon asserts that, while it was "reckless and dangerous" for him to point a loaded gun at Dowell, Carson's testimony demonstrates that he had "no known intention to shoot the driver" and no "knowledge that it was happening or going to happen." *Id.* at 21.

[38] However, the undisputed evidence demonstrates that Shannon shot Dowell during the commission of a robbery. Based on that fact, the State also charged Shannon with felony murder, which is defined as a person who "kills another human being while committing or attempting to commit" robbery. I.C. § 35-42-1-1(2). In order to prove that Shannon had committed felony murder, "the State need not prove that [Shannon] acted with any particular mental state—the killing could be totally accidental—so long as the State does prove that the killing occurred while [Shannon] was committing (or attempting to commit) a specified felony." *Thomas v. State*, 827 N.E.2d 1131, 1133 (Ind. 2005).

[39] Here, even if Shannon had only shot Dowell accidentally, he would still be guilty of felony murder, not reckless homicide. As such, he would not be entitled to the instruction on reckless homicide unless he could additionally show that there was a serious evidentiary dispute as to whether the shooting occurred during the commission of an armed robbery. But Shannon does not make any such argument on appeal. Rather, he disregards the fact that he shot Dowell while robbing Dowell of $600 worth of marijuana. Shannon has failed to acknowledge that the killing occurred during the commission of a robbery and, thus, has failed to present an argument supported by cogent reasoning on

this issue. Accordingly, this issue is waived.[2] We therefore affirm the court's denial of his proffered jury instruction.

### Issue Four: Sufficiency of the Evidence

[40] Finally, Shannon contends that the State failed to present sufficient evidence to support his convictions. Our standard of review on a claim of insufficient evidence is well settled:

> For a sufficiency of the evidence claim, we look only at the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh the evidence. We will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id*.

*Love v. State*, 73 N.E.3d 693. 696 (Ind. 2017).

[41] To convict Shannon of murder, the State was required to prove that he had knowingly or intentionally killed Dowell. I.C. § 35-42-1-1(a). And to convict Shannon of robbery, the State was required to prove that he had knowingly or intentionally taken property from Dowell or from Dowell's presence by using or threatening the use of force. I.C. § 35-42-5-1(a)(1).

---

[2] Had the State charged Shannon only with murder, his argument regarding a jury instruction on the lesser included offense based on a serious evidentiary dispute might have been plausible. But, here, the murder and the felony murder charges are intertwined, and Shannon does not dispute that Dowell was killed during the commission of a felony. Thus, the trial court correctly declined to give Shannon's proffered jury instruction on reckless homicide.

[42]   On appeal, Shannon contends that the State presented insufficient evidence to support his convictions for murder and robbery because the State failed to establish his identity as the offender. In the alternative, he contends that the State failed to present sufficient evidence to support his conviction for murder because the State failed to demonstrate that he had knowingly killed Dowell. We address each argument in turn.

## Identity

[43]   Shannon first asserts that the State presented insufficient evidence to prove that he was the individual who had committed the offenses. Specifically, Shannon asserts that Carson described the shooter as "tall," "dark skinned," "large," and "old," but that Shannon is 21 years old, 5'9", and 180 pounds, and his booking picture "shows an obviously young-looking face." Appellant's Br. at 27, 28. Shannon also asserts that Carson "could not identify anyone as the shooter from a photo array that included Mr. Shannon's picture." *Id*. at 28. Further, Shannon contends that Palmer testified that Shannon "got dressed in 'all black'" clothing but that the video footage showed that the shooter was wearing "*light*-colored pants." *Id*. at 29, 30 (emphasis in original). Accordingly, Shannon contends that both of the State's star witnesses "gave testimony clearly showing that Mr. Shannon and the shooter were two completely different people." *Id*. at 30. In addition, Shannon contends that Palmer's testimony could not be believed as "she had [a] motive to fabricate" her testimony. *Id*. And Shannon contends that he was "excluded from all fingerprints examined

from the crime scene" and that his DNA "was not found on anything related to or used in the crime," other than the gold mouthpiece. *Id.* at 32.

[44] However, the evidence most favorable to the trial court's judgment demonstrates that, after McClendon told Shannon that he did not get what he wanted from Dowell, Shannon changed into black clothes, put a mask over his face, and left his apartment. Further, Carson testified that, a few minutes after McClendon had exited the car, a man dressed in a black hoodie and black mask approached Dowell's car, opened the rear driver's side door, and pointed a gun at Dowell. The man in the mask then hit Dowell in the face with the pistol and reached toward Dowell's left pocket to get the marijuana. Carson also testified that, during the struggle, the man's mask got pulled down, and Carson observed that the man had "gold teeth." Tr. Vol. II at 198. The driver then put the car in drive and drove off, at which point the man shot Dowell, killing him. And Carson testified that, following the incident, he observed the shooter run toward Shannon's apartment.

[45] Further, Palmer testified that, a few minutes after Shannon had exited his apartment, he returned and told Palmer that he "had to shoot him because he was going to ride off" with McClendon. Tr. Vol. III at 184. The evidence also demonstrates that, when officers first investigated the incident, officers observed marijuana on a table in Shannon's apartment. Then, during the subsequent search of Shannon's apartment, officers found the gun that was used to shoot Dowell, a gold mouthpiece that contained Shannon's DNA, residue from marijuana in a plastic bag, and remnants of marijuana in a toilet.

[46] Based on that evidence, a reasonable jury could conclude that Shannon was the person who had robbed and killed Dowell. Shannon's arguments on appeal are merely a request that we reweigh the evidence, which we cannot do. We hold that the State presented sufficient evidence to demonstrate that Shannon was the perpetrator of the offenses.

### Knowingly

[47] Shannon also contends that, even if the State presented sufficient evidence to demonstrate that he was the offender, the State failed to prove that he had knowingly killed Dowell.[3] A person engages in conduct knowingly if, "when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b).

[48] On appeal, Shannon contends that he was "compelled by" the motion of the car to shoot the gun because the movement of the car caused him "to lose his balance and squeeze the trigger." Appellant's Br. at 31. In other words, he contends that the evidence demonstrates that it was "not a conscious choice" but rather the "physics of a moving car" that caused him to discharge the gun. *Id*. at 32.

[49] However, the evidence demonstrates that Shannon pointed a loaded firearm at Dowell in an attempt to rob him of $600 of marijuana. Further, Palmer

---

[3] In the Information, the State only asserted that Shannon had knowingly killed Dowell. *See* Appellant's App. Vol. II at 36.

testified that, when Shannon returned to his apartment, he told Palmer that "he had to shoot him because he was going to ride off" with McClendon. Tr. Vol. III at 184. Based on that evidence, a reasonable jury could conclude that Shannon had knowingly killed Dowell. Again, Shannon's arguments on this issue are a request that we reweigh the evidence, which we cannot do. The State presented sufficient evidence to support Shannon's conviction for murder.

### Conclusion

[50] In sum, we hold that Shannon lacked standing to challenge any evidence derived from Palmer's recorded phone call because he was neither a party to the conversation nor the target of any interception. We also hold that any error in the trial court's admission of photographs of fired cartridges that officers had found in and around Shannon's apartment was harmless in light of the totality of evidence against him. Further, we hold that Shannon failed to present a cogent argument as to whether he was entitled to a jury instruction on reckless homicide. And we hold that the State presented sufficient evidence to establish that Shannon was the individual who had robbed and killed Dowell and to demonstrate that Shannon had knowingly killed Dowell. We therefore affirm Shannon's convictions.

[51] Affirmed.

Kirsch, J., and Brown, J., concur.