**UNITED STATES of America,
Appellant,**

v.

**George H. VEST, Defendant, Appellee.**

**No. 86–1770.**

United States Court of Appeals,
First Circuit.

Argued Jan. 9, 1987.

Decided March 9, 1987.

---

John F. DePue, Dept. of Justice, Washington, D.C., with whom Robert S. Mueller, U.S. Atty., Boston, Mass., was on brief, for appellant.

Willie J. Davis, Boston, Mass., for defendant, appellee.

Before BOWNES, Circuit Judge, ALDRICH, Senior Circuit Judge, and GIGNOUX,* Senior District Judge.

GIGNOUX, Senior District Judge.

The United States appeals from an order of the district court granting in part de-

* Of the District of Maine, sitting by designation.

fendant-appellee George H. Vest's motion to suppress a tape recording that the government intended to introduce at Vest's trial on charges of making false declarations before a grand jury, in violation of 18 U.S.C. § 1623 (1982). The district court held that the recording must be excluded from the government's case-in-chief because it was made in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–20 (1982). *United States v. Vest,* 639 F.Supp. 899 (D.Mass.1986) (Keeton, J.). We now affirm.

I.

In May 1983 one Jesse James Waters was arrested and charged with various offenses stemming from the shooting of Detective Francis J. Tarantino of the Boston Police Department. Following Waters' indictment and release on bail, he met with Tarantino and Vest, also a Boston Police detective, and the three reached an agreement whereby Waters would pay a total of $300,000 to Tarantino, using Vest as a conduit for the payments, in exchange for Tarantino's efforts to assure that Waters would not be sentenced to imprisonment if he entered a guilty plea to the charges against him. On June 15, 1984, Vest met Waters at his office and Waters gave Vest $35,000 for Tarantino. Without Vest's knowledge, Waters electronically recorded the transaction and accompanying discussion. According to Waters' testimony at the suppression hearing, his reason for making the recording was to create a "receipt" in the event that Tarantino later claimed Waters had failed to make the payment.

In October 1984 Waters was tried and convicted in the Suffolk County, Massachusetts, Superior Court on the charges related to the shooting of Tarantino. Ultimately Waters was sentenced to an eight to ten-year term of imprisonment, and in December 1984 he turned the tape over to federal law enforcement authorities, who began an investigation of the payoff scheme. In July 1985 Vest, having been granted immunity, testified before a grand jury that he had not participated in Waters' payment of money to Tarantino and that he had never received any money from Waters. At this point the tape recording of his conversation with Waters, which had been played for Vest before he testified, was played again, whereupon Vest denied that his voice appeared on the tape. On the basis of these statements the grand jury indicted Vest on three counts of making false declarations before a grand jury, in violation of 18 U.S.C. § 1623 (1982).

Prior to trial Vest moved to suppress the tape, arguing that Waters had made the tape in violation of 18 U.S.C. § 2511(1)(a) and (2)(d)[1] and that its introduction into evidence would therefore violate 18 U.S.C. § 2515, which directs that:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

---

**1.** Section 2511(1)(a) provides:
> Except as otherwise specifically provided in this chapter any person who … willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication … shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 2511(1)(a) (1982).

Section 2511(2)(d) provides:
> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.

18 U.S.C. § 2511(2)(d) (1982).

The district court found that the tape was made in violation of section 2511(1)(a) and (2)(d). 639 F.Supp. at 901–08.[2] The court held further that the government's disclosure of the tape would violate 18 U.S.C. § 2511(1)(c),[3] and that section 2515 consequently prohibited the use of the tape in the government's case-in-chief. *Id.* at 908–15. It therefore granted Vest's suppression motion in part, but denied the motion insofar as it sought to preclude the government from using the tape to impeach Vest if he chose to testify at trial. The court then granted the government's motion to sever Count 3 (based on Vest's denial that his voice appeared on the tape) from the remaining counts for purposes of taking the instant appeal. The case proceeded to a jury trial on the two remaining false statement counts. Vest was convicted on both counts and sentenced to three years imprisonment.

On appeal the government raises two arguments. First, the government asserts that the exclusionary rule of section 2515 is inapplicable where the government is merely the innocent recipient, rather than the procurer, of an illegally-intercepted communication. Second, the government asserts that even if section 2515 applies to evidence offered by innocent recipients of illegally-intercepted communications, this Court should read into that section an exception permitting the use of illegally-intercepted communications in perjury prosecutions. We address each of these contentions in turn.

## II.

The government acknowledges that, read literally, section 2515 requires the exclusion from evidence of any wire or oral communication if the disclosure of that information would violate Title III. The government contends, however, that such a literal reading is inappropriate because it would produce results "plainly at variance with the policy of the legislation as a whole," quoting *United States v. American Trucking Associations*, 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). A literal reading might, for example, forbid the use in evidence of an illegal recording in a prosecution brought under section 2511(1)(a) against the maker of that illegal recording. Thus, because Congress could not have intended section 2515 to produce a result so clearly contrary to the legislative purpose, an exception to that section's exclusionary rule allows illegally intercepted communications to be introduced as evidence against the interceptor in criminal proceedings for violations of Title III. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 99–100 (1968) (stating that disclosure of illegally-intercepted communications "would be necessary in the investigation and prosecution of an illegal wiretapper himself"), *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2188; *United States v. Liddy*, 354 F.Supp. 217, 221 (D.D. C.1973). It is appropriate, the argument goes, that other exceptions should be read into section 2515 to avoid producing similarly paradoxical results. Specifically, the government argues, the purpose of section 2515 is to deter violations of Title III's other provisions, and it would be pointless to apply section 2515 against the government where, as here, the government is the innocent recipient, rather than the guilty interceptor, of an illegally-intercepted communication.

The district court accepted the government's argument that an inquiry into the purpose of section 2515 is necessary in order properly to interpret that section's exclusionary rule. But the district court concluded, and we agree, that the govern-

---

**2.** On this appeal the government does not challenge the district court's finding that Waters made the tape in violation of these two provisions.

**3.** Section 2511(1)(c) declares:

Except as otherwise specifically provided in this chapter any person who ... willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection ... shall be fined not more than $10,000 or imprisoned not more than five years, or both. 18 U.S.C. § 2511(1)(c) (1982).

ment's characterization of section 2515 as solely aimed at deterring Title III violations is too narrow. In *Gelbard v. United States,* 408 U.S. 41, 47–52, 92 S.Ct. 2357, 2360–63, 33 L.Ed.2d 179 (1972), the Supreme Court exhaustively reviewed the legislative history of Title III and concluded that "the protection of privacy was an overriding congressional concern" when it enacted Title III, *id.* at 48, 92 S.Ct. at 2361, and that section 2515's "importance as a protection for 'the victim of an unlawful invasion of privacy' could not be more clear." *Id.* at 50, 92 S.Ct. at 2362. As the Court recognized in *Gelbard, id.* at 51–52, 92 S.Ct. at 2362–63, and as we have previously noted, *In re Globe Newspaper Co.,* 729 F.2d 47, 54 (1st Cir.1984)(citing *Providence Journal Co. v. F.B.I.,* 602 F.2d 1010, 1013 (1st Cir.1979)), an invasion of privacy is not over when an interception occurs, but is compounded by disclosure in court or elsewhere. The impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted by the guilty interceptor (here, Waters).

■ The government argues that we should read into section 2515 the exception to the fourth amendment exclusionary rule for evidence falling into the government's hands after a private search and seizure, *see, e.g. United States v. Jacobsen,* 466 U.S. 109, 113–18, 104 S.Ct. 1652, 1656–59, 80 L.Ed.2d 85 (1984). But the fourth amendment exclusionary rule is a judicially-fashioned rule serving different purposes than the congressionally-created rule of section 2515—a rule that we are here limited to interpreting rather than modifying. We agree with the district court that to hold that section 2515 allows the government's use of unlawfully intercepted communications where the government was not the procurer "would eviscerate the statutory protection of privacy from intrusion by illegal private interception." 639 F.Supp. at 914–15. The protection of privacy from invasion by illegal private interception as well as unauthorized governmental interception plainly "play[s] a central role

in the statutory scheme," *see United States v. Giordano,* 416 U.S. 505, 528 (1974).

We decline to read into section 2515 an exception permitting the introduction in evidence of an illegally-intercepted communication by an innocent recipient thereof.

### III.

The government's fallback position is that this Court should read into section 2515 an exception permitting the use of illegally-intercepted communications in perjury prosecutions. The government relies on the following passage in the Senate Report accompanying the Omnibus Crime Control and Safe Streets Act of 1968:

Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may not be received in evidence in any proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision of a State, where the disclosure of that information would be in violation of this chapter. The provision must, of course, be read in light of section 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly (*Nardone v. United States,* 302 U.S. 379 [58 S.Ct. 275, 82 L.Ed. 314] (1937)) or indirectly obtained in violation of the chapter. (*Nardone v. United States,* 308 U.S. 338 [60 S.Ct. 266, 84 L.Ed. 307] (1939).) There is, however, no intention to change the attenuation rule. See *Nardone v. United States,* 127 F.2d 521 (2d), certiorari denied, 316 U.S. 698 [62 S.Ct. 1296, 86 L.Ed. 1767] (1942); *Wong Sun v. United States,* 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963). Nor generally to press the scope of the suppression role [sic] beyond present search and seizure law. See *Walder v. United States,*

347 U.S. 62 [74 S.Ct. 354, 98 L.Ed. 503] (1954).

S.Rep. No. 1097 at 96, *reprinted in* 1968 U.S.Code Cong. & Admin.News at 2184–85.

The government argues that the last sentence of the quoted passage, especially the citation of *Walder,* manifests a congressional intent to delegate to the courts the task of developing exceptions to section 2515 paralleling judicially-developed exceptions to the fourth amendment exclusionary rule. *Walder* recognized an exception to the fourth amendment exclusionary rule permitting the use of unlawfully-seized evidence for *impeachment* purposes. The government contends that the citation to *Walder* was merely intended as one example of how Congress intended section 2515 to be subject to the same exceptions as the fourth amendment exclusionary rule. Because we and other courts have recognized an exception to the fourth amendment exclusionary rule permitting the use of unlawfully-seized evidence in perjury prosecutions, *see United States v. Finucan,* 708 F.2d 838, 845 (1st Cir.1983) (collecting cases), the government argues that the same exception should be incorporated in section 2515. We disagree, for the following reasons.

■ First, we note that Congress, acting in 1968, specified its intent not to "press the scope of the suppression rule [sic] beyond *present* search and seizure law" (emphasis added). As the district court noted, the government has cited no case decided before or during 1968 that recognized an exception to the fourth amendment exclusionary rule for perjury prosecutions; the earliest such case cited by the government is *United States v. Turk,* 526 F.2d 654, 667 (5th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). We hardly think the above-quoted sentence from the Senate Report establishes that Congress anticipated by eight years this particular judicial contraction of the fourth amendment exclusionary rule and approved a parallel exception to section 2515's exclusionary rule. And we believe that if Congress had intended to commit to the courts general authority to create exceptions to section

2515 in the same manner as the courts might develop future exceptions to the fourth amendment exclusionary rule, Congress could certainly have said so more clearly. We therefore agree with the district court's conclusion that Congress did not intend to confer such discretion on the courts.

Second, a full reading of the quoted passage in the Senate Report demonstrates that Congress carefully considered which aspects of the fourth amendment exclusionary rule would and would not be incorporated into section 2515. For example, Congress clearly intended that the provisions of section 2518(10)(a), which defines the class entitled to make a motion to suppress, rather than judicially-developed notions of "standing," would control the question of who could bring such a motion. Congress expressly declared in the Senate Report that judicially-developed concepts of directly-obtained and indirectly-obtained evidence and of attenuation were applicable to section 2515. S.Rep. No. 1097 at 96; *reprinted in* 1968 U.S.Code Cong. & Admin.News at 2185. Moreover, in section 2515 Congress specifically expanded upon fourth amendment jurisprudence as it existed in 1968 (and as it exists today) by making that section applicable to all federal and state proceedings, whether characterized as civil, criminal, administrative, legislative, regulatory or otherwise. *Compare* 1 W. LaFave, *Search and Seizure* § 1.5 (1978 & Supp. 1986) (indicating that fourth amendment exclusionary rule does not apply across the board). In view of Congress' careful consideration of these matters, we are reluctant to conclude that Congress intended the single sentence here relied upon by the government as a blank check to the courts to incorporate into section 2515 every change in the scope of the fourth amendment exclusionary rule.

Third, even if Congress did intend to permit the courts to create exceptions to section 2515 paralleling newly-developed exceptions to the fourth amendment exclusionary rule, other provisions of Title III would make us reluctant to develop an exception permitting the use of illegally-in-

tercepted communications in perjury prosecutions. Specifically, section 2516(1) declares that a federal judge of competent jurisdiction may authorize or approve the interception of wire or oral communications when such interception may provide or has provided evidence of certain designated major offenses. Section 2516(2) gives parallel authority to state court judges. Section 2517(3) permits the disclosure in court of communications properly intercepted in the course of investigating these specified crimes.

■ Congress' authorization of the interception and disclosure of communications for the purpose of investigating or prosecuting these crimes reflects Congress' judgment that such interceptions should "be limited to certain major types of offenses and specific categories of crime with assurances that the interception is justified and that the information obtained thereby will not be misused." Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, § 801(d), 82 Stat. 197, 211 (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News at 253. The Senate Report explained that "[b]ecause of the importance of privacy, such interceptions should ... be limited to major offenses." S.Rep. No. 1097 at 89, *reprinted in* 1968 U.S.Code Cong. & Admin.News at 2177. "Each offense has been chosen either because it is intrinsically serious or because it is characteristic of organized crime." S.Rep. No. 1097 at 97, *reprinted in* 1968 U.S.Code Cong. & Admin.News at 2186; *see Dalia v. United States*, 441 U.S. 238, 252 & n. 13, 99 S.Ct. 1682, 1690 & n. 13 (1979). Clearly, by enumerating those crimes deemed serious enough to justify interception and disclosure of private communications, Congress intended to strike a balance between Title III's twin purposes of protecting privacy and recognizing the importance and legality of intercepting communications for the purpose of combatting crime.[4]

Conspicuously absent from the list of enumerated offenses are the federal crimes of perjury, subornation of perjury, and false declarations before a grand jury or court, 18 U.S.C. §§ 1621–23 (1982), and their state-law counterparts. These omissions are particularly noteworthy because Congress did choose to include violations of somewhat related provisions such as influencing or injuring an officer, juror, or witness generally (18 U.S.C. §§ 1503, 1512, 1513), obstruction of criminal investigations (18 U.S.C. § 1510), and obstruction of state or local law enforcement (18 U.S.C. § 1511). Surely perjury is an offense as "intrinsically serious or ... characteristic of organized crime" as are there, yet Congress did not see fit to include perjury in the list of offenses justifying the disclosure in court of private communications. We will not upset the balance struck by Congress.

Fourth, again assuming *arguendo* that Congress intended to delegate to the courts the task of developing exceptions to section 2515's exclusionary rule paralleling newly-developed exceptions to the fourth amendment exclusionary rule, Congress could not have intended the courts to disregard in that process the different policy considerations underlying the two rules. As we have previously noted, protection of privacy was the dominant concern of Congress when it enacted section 2515, *see Gelbard*, 408 U.S. at 48, 92 S.Ct. at 2361, whereas the primary purpose of the fourth amendment exclusionary rule is the deterrence of unreasonable searches and seizures in violation of the fourth amendment, *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3412, 82 L.Ed.2d 677 (1984). As this Court observed in *United States v. Finucan*, 708 F.2d at 845, when illegally seized evidence is admitted in a perjury prosecution, "the admission of the evidence will ordinarily have little if any impact on the deterrent effect of the exclusionary rule." We agreed with the Fifth Circuit that

[w]hen the Government is effectively denied the possibility of direct prosecution

---

4. We thus reject, as did the district court, the conclusion reached in *United States v. Traficant*, 558 F.Supp. 996, 1001–02 (N.D.Ohio 1983), that section 2511(2)(d) does not operate to ban the disclosure of illegally-intercepted communications where the communications themselves were for the purpose of furthering "illegal activities."

on the basis of illegally seized evidence, no significant additional deterrent effect could be realized by suppressing the evidence at a trial of the search victim for a crime committed after the illegal search and with the knowledge that the illegal search occurred.

*Id.* (quoting *United States v. Turk,* 526 F.2d at 667). In the section 2515 context, however, disclosure of an illegally-intercepted communication at a perjury trial will result in a significant additional invasion of privacy beyond that occasioned by the illegal interception itself, *see Gelbard,* 408 U.S. at 51–52, 92 S.Ct. at 2362–63; *Globe Newspaper,* 729 F.2d at 54, thus thwarting an important goal of section 2515. Although our own view may be that in this context punishing perjury is a more important policy goal than protecting privacy, we are not free to disregard the balance struck by Congress.

[4] Finally, we are not persuaded that the exception to the section 2515 exclusionary rule allowing illegally-intercepted communications to be used for impeachment, *see United States v. Winter,* 663 F.2d 1120, 1154 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983); *United States v. Caron,* 474 F.2d 506 (5th Cir.1973), supports an interpretation of that section as not prohibiting the use of unlawfully-intercepted communications in perjury prosecutions. Congress' citation to *Walder,* the case which first established this limited exception to the fourth amendment exclusionary rule, furnishes compelling evidence that Congress intended an impeachment exception to section 2515. The government has been unable to point to anything in the legislative history to suggest that Congress intended the section 2515 exclusionary rule to be subject to an exception for perjury prosecutions.

We therefore decline to read into section 2515 an exception permitting the use of illegally-intercepted communications in perjury prosecutions.

### IV.

*The order of the district court is affirmed.*