PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

   *Plaintiff-Appellee,*

v.

DANIEL EUGENE CRABTREE, a/k/a
Buck Crabtree,

   *Defendant-Appellant.*

No. 08-4411

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
James P. Jones, Chief District Judge.
(2:05-cr-00004-jpj-1)

Argued: March 27, 2009

Decided: May 19, 2009

Before MICHAEL and TRAXLER, Circuit Judges, and
Thomas D. SCHROEDER, United States District Judge for
the Middle District of North Carolina,
sitting by designation.

Vacated and remanded by published opinion. Judge Traxler
wrote the opinion, in which Judge Michael and Judge
Schroeder joined.

## COUNSEL

**ARGUED:** Brian Jackson Beck, OFFICE OF THE FED-
ERAL PUBLIC DEFENDER, Abingdon, Virginia, for Appel-

lant. Steven Randall Ramseyer, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee. **ON BRIEF:** Larry W. Shelton, Federal Public Defender, Abingdon, Virginia, for Appellant. Julia C. Dudley, Acting United States Attorney, Roanoke, Virginia, for Appellee.

---

## OPINION

TRAXLER, Circuit Judge:

Daniel Crabtree was sentenced to twenty-four months imprisonment for violating the terms of his supervised release. The government established some of the violations by introducing into evidence certain audio tapes that were made by Crabtree's girlfriend in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. §§ 2510 – 2522 (West 2000 & Supp. 2008). We agree with Crabtree that although the government was not involved in the interception of Crabtree's conversations, Title III nonetheless prohibited the government from introducing evidence of the intercepted conversations. We therefore vacate the district court's judgment and remand for further proceedings.

### I.

While on supervised release, Crabtree lived with his girlfriend Betty Starnes in her house. George Huffnagle also lived in the house. In March 2008, Starnes became suspicious about Crabtree's relationship with his ex-wife, and Starnes began taping the calls made on her home telephone.

On March 4, Starnes contacted Crabtree's probation officer and told him that she had asked Crabtree to move out of her house. She also told the probation officer that she had recorded Crabtree's phone calls and heard him threaten to burn her house and her truck and try to set up Huffnagle for arrest.

The probation officer obtained copies of Starnes's tapes and ultimately initiated proceedings to revoke Crabtree's supervised release. The probation officer's report alleged thirteen violations of the terms of Crabtree's supervised release. Most of the alleged violations were unrelated to the illegal recordings, but instead involved Crabtree's failure to make required restitution payments, failure to follow the probation officer's instructions, and the like. Several of the violations alleged more serious conduct, however, some of which (such as Crabtree's arson threats) the government learned about only because of the tape recordings.

At the revocation hearing, the district court, over Crabtree's objection, permitted the government to introduce the recordings of Crabtree's conversations. The district court ultimately determined that Crabtree had committed all of the violations alleged in the probation report, and the court sentenced Crabtree to a prison term of 24 months to be followed by an additional three years of supervised release.

## II.

### A.

Title III prohibits, among other things, the interception of a telephone conversation by someone not a party to the conversation, *see* 18 U.S.C.A. § 2511(1)(a); *id.* § 2511(2)(d), and the intentional use or disclosure of the contents of a conversation intercepted in violation of the act, *see id.* §§ 2511(1)(c) & (d). Starnes was not a party to the recorded conversations and Crabtree did not consent to the recording. Thus, there is no dispute that Starnes violated Title III by recording Crabtree's telephone conversations or that disclosure of the contents of Crabtree's conversations is prohibited by Title III.

Because the recording of his conversations violated Title III, Crabtree moved in accordance with 18 U.S.C.A. § 2515 to exclude from the revocation hearing the recordings and any

evidence derived from the recordings. Section 2515 is a statutory exclusionary rule that generally prohibits the introduction into evidence of illegally intercepted communications or evidence derived from illegally intercepted communications. The district court denied the motion. The court noted that the government had "no involvement in the illegal taping of these conversations," which the court believed warranted application of an "implied exception" to the exclusionary rule set forth in § 2515. J.A. 27. Crabtree appeals, arguing that the district court erred by applying a "clean hands" exception to § 2515.

B.

Whether § 2515 should be understood as containing a "clean hands" exception to its exclusionary rule is an issue that has divided the circuits. The Sixth Circuit has concluded that § 2515 does not preclude the government in a criminal prosecution from introducing evidence of a recording made in violation of Title III if the government had no involvement in the illegal interception, *see United States v. Murdock*, 63 F.3d 1391, 1404 (6th Cir. 1995), while the First, Third, and Ninth Circuits have refused to read such a clean-hands exception into § 2515, *see Chandler v. United States Army*, 125 F.3d 1296, 1302 (9th Cir. 1997); *In re Grand Jury*, 111 F.3d 1066, 1079 (3d Cir. 1997); *United States v. Vest*, 813 F.2d 477, 481 (1st Cir. 1987). We agree with the majority and conclude that § 2515 does not permit an exception to its exclusionary rule in cases where the government was not involved in illegal interception.

In our view, the issue is resolved by the language of § 2515 itself. Section 2515 states, in its entirety, that

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other

proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C.A. § 2515. The statute seems to clearly and unambiguously prohibit the use in court of improperly intercepted communications; we simply see no gaps or shadows in the language that might leave lurking a clean-hands exception. Because the statute is clear and unambiguous, our inquiry typically would start and stop with its plain language. *See, e.g.*, *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." (citations and internal quotation marks omitted)).

Under some circumstances, however, a court may look beyond the language of a statute.

If a literal reading of a statute produces an outcome that is demonstrably at odds with clearly expressed congressional intent to the contrary, or results in an outcome that can truly be characterized as absurd, *i.e.*, that is so gross as to shock the general moral or common sense, then we can look beyond an unambiguous statute and consult legislative history to divine its meaning.

*Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 304 (4th Cir. 2000) (citations and internal quotation marks omitted), *aff'd sub nom. Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002). We do not believe that this is one of the "exceptionally rare" cases

where it is appropriate to look beyond the clear statutory language. *Id.*

"[T]he protection of privacy was an overriding congressional concern" when Title III was enacted. *Gelbard v. United States*, 408 U.S. 41, 48 (1972). The act thus places strict conditions on the government's use of wiretapping and electronic surveillance and largely prohibits private, nonconsensual wiretapping. It is the broad exclusionary rule of § 2515 that provides the teeth to these prohibitions, as recognized in the Congressional findings supporting the act:

> In order to *protect effectively the privacy of wire and oral communications*, to protect the integrity of court and administrative proceedings, . . . *it is necessary* for Congress to define on a uniform basis the circumstances under which the interception of wire and oral communications may be authorized, *to prohibit* any unauthorized interception of such communications, and *the use of the contents thereof in evidence in courts* and administrative proceedings.

Pub. L. No. 90-351, § 801(b), 82 Stat. 197, 211 (1968) (emphasis added). Indeed, as the Supreme Court has explained, "[t]he unequivocal language of § 2515 *expresses the fundamental policy adopted by Congress* on the subject of wiretapping and electronic surveillance." *Gelbard*, 408 U.S. at 47 (emphasis added). It therefore seems quite difficult to conclude that applying § 2515 as written — without a clean-hands exception — could be "demonstrably at odds with clearly expressed congressional intent to the contrary." *Sigmon Coal*, 226 F.3d at 304 (internal quotation marks omitted).

It would be even more difficult to conclude that the rejection of a clean-hands exception to § 2515's exclusionary rule would lead to absurd results. Title III prohibits not just the wrongful *interception* of communications, but the *disclosure* of improperly intercepted communications. A disclosure in

court of a private conversation violates the privacy of the victim as much as any other kind of disclosure, and the lack of government involvement does not diminish the intrusion into the victim's privacy. *See Vest*, 813 F.2d at 481 ("[A]n invasion of privacy is not over when an interception occurs, but is compounded by disclosure in court or elsewhere. The impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted by the guilty interceptor . . . ."). Accordingly, we have no doubt that excluding evidence of illegally intercepted communications without regard to whether the government was involved in the procurement furthers Congress's overriding interest in protecting the privacy of wire communications.

We recognize, of course, that the absence of a clean-hands exception to § 2515 could on occasion prevent the government from obtaining a criminal conviction. There is no reason, however, for us to presume that Congress was somehow unaware of this possibility. Title III does not permit law enforcement officials to use wiretapping and electronic surveillance for all criminal investigations, but only in connection with the investigation of certain specified crimes. *See* 18 U.S.C.A. § 2516(1). Section 2516 thus reflects a Congressional determination that privacy interests sometimes outweigh law enforcement interests. *See Vest*, 813 F.2d at 483 ("[B]y enumerating those crimes deemed serious enough to justify interception and disclosure of private communications, Congress intended to strike a balance between Title III's twin purposes of protecting privacy and recognizing the importance and legality of intercepting communications for the purposes of combatting crime."). An interpretation of § 2515 that likewise on occasion protects privacy at the expense of law enforcement is not absurd, but is a necessary consequence of the balance struck by Congress. And as the Third Circuit has explained, it is not for us "to restrike the balance that Congress has already struck by placing in the statute a clean hands

exception that Congress did not." *In re Grand Jury*, 111 F.3d at 1079.

Nothing in the Sixth Circuit's analysis of the issue convinces us that it would be proper to read a clean-hands exception into § 2515's exclusionary rule. The Sixth Circuit concluded that in cases where the government was not involved in the illegal interception, suppression was not required because suppression would have no deterrent effect on the government. *See Murdock*, 63 F.3d at 1402-03. The court believed that the legislative history of the act revealed an intent to protect the victim of an illegal interception *only* from efforts "by the *perpetrator* to use the interception against the victim," *id.* at 1403, and that there thus was "nothing in the legislative history which requires that the government be precluded from using evidence that literally falls into its hands." *Id.*

As discussed above, we believe the language of § 2515 to be plain and unambiguous, which largely forecloses any inquiry into the unenacted legislative history of the statute. *See Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear."). Nonetheless, even if resort to the legislative history were appropriate, we disagree with the inferences drawn from that history by the Sixth Circuit.

While the Senate report addressing Title III speaks of denying "[t]he perpetrator . . . the fruits of his unlawful actions in civil and criminal proceedings," S. Rep. No. 90-1097 (1968), 1968 U.S.C.C.A.N. 2112, 2156, we do not understand that language as suggesting a limitation on the scope of § 2515. A vengeful former employee or estranged spouse might well intercept private conversations with the fervent hope of discovering information that might land the reviled employer or spouse in jail. Rather than denying such perpetrators the fruits of their illegal conduct, the Sixth Circuit's reading of § 2515 would perversely give them the very benefit that they sought.

And while we agree with the Sixth Circuit that suppression of the contents of a private communication would have no deterrent effect on the government if the government was not involved in the illegal interception, suppression would nonetheless have a deterrent effect on the private party intercepting the communication. If vengeful employees know that their recordings cannot be used to send their employer to jail, they would be less inclined to illegally record the boss's conversations.

The legislative history of Title III indicates that § 2515 was not intended "generally to press the scope of the suppression role beyond present search and seizure law," S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. at 2185, and the Sixth Circuit believed its holding was bolstered by the fact that the Fourth Amendment does not require suppression of evidence obtained through searches conducted by private parties, *see Murdock*, 63 F.3d at 1403. The Fourth Amendment, of course, constrains state and federal officials only; it has no applicability to private parties. Title III, by contrast, explicitly applies to private parties as well as governmental officials. Because the Fourth Amendment and Title III differ greatly in scope and purpose, we believe it would be inappropriate to treat the judicially created Fourth Amendment exclusionary rule as impliedly setting the boundary for the broader, statutorily created exclusionary rule of § 2515.

We must, however, acknowledge a point made by the government. Other circuits have concluded that § 2515 does *not* prohibit the use of improperly intercepted communications for impeachment purposes in criminal cases, *see United States v. Wuliger*, 981 F.2d 1497, 1505-06 (6th Cir. 1992); *United States v. Echavarria-Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990); *United States v. Winter*, 663 F.2d 1120, 1154 (1st Cir. 1973); *United States v. Caron*, 474 F.2d 506, 508 (5th Cir. 1981), and this circuit (in the context of a civil case) has similarly recognized an impeachment exception to § 2515, *see Culbertson v. Culbertson*, 143 F.3d 825, 827-28 (4th Cir.

1998). The government seems to suggest that our recognition of an impeachment exception to § 2515 requires us to recognize a clean-hands exception as well. We disagree. Section 2515 prohibits courts from "receiv[ing] *in evidence*" improperly intercepted communications. 18 U.S.C.A. § 2515 (emphasis added). Courts have long distinguished impeachment evidence from substantive evidence, *see, e.g.*, *United States v. Ince*, 21 F.3d 576, 580 (4th Cir. 1994); *Martin v. United States*, 528 F.2d 1157, 1161 (4th Cir. 1975), and material inadmissible as substantive evidence is often admissible for the limited purpose of impeaching a witness's testimony, *see, e.g.*, *Michigan v. Harvey*, 494 U.S. 344, 346 (1990); *Walder v. United States*, 347 U.S. 62, 65 (1954). Given this legal backdrop, the impeachment exception is reconcilable with the commands of § 2515, and we therefore do not believe that the logic underlying the impeachment exception compels us to recognize the clean-hands exception sought by the government.

## III.

Because the plain language of § 2515 prohibits the introduction of improperly intercepted communications without regard to whether the government was involved in the interception, the district court erred by admitting evidence of the conversations taped by Starnes. Although the district court determined that Crabtree had committed numerous violations of the terms of his supervised release, the violations stemming from Starnes's recordings were far and away the most serious of the violations.* Because there is nothing in the record suggesting that the district court would have imposed the same sentence had it not considered the recordings, the error cannot

---

*At the revocation hearing, the government also presented evidence of threats Crabtree made against his probation officer. Those threats, however, were made after Crabtree was arrested for the supervised release violations at issue here and were not included in the petition seeking revocation of Crabtree's supervised release.

be considered harmless. Accordingly, we vacate the district court's judgment and remand for further proceedings. On remand, the district court must exclude the recordings of Crabtree's conversations made by Starnes and any evidence derived from those recordings, as required by 18 U.S.C.A. § 2515.

*VACATED AND REMANDED*