NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0400n.06

Case No. 24-5988

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Aug 14, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
|  | ) | |
|  | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
|  | ) | THE WESTERN DISTRICT OF |
| ASHLEY GRAYSON, | ) | TENNESSEE |
| Defendant-Appellant. | ) | |
|  | ) | OPINION |

Before: THAPAR, NALBANDIAN, and READLER, Circuit Judges.

**READLER, Circuit Judge.** Ashley Grayson hired a husband-and-wife duo—Olivia Johnson and Brandon Thomas—to kill three people. But, unknown to Grayson, Johnson recorded a video call in which Grayson discussed the murders and turned those recordings over to the authorities. Based on this evidence, a federal jury convicted Grayson of conspiring to use interstate commerce facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958. She now appeals, challenging her conviction on several grounds. We affirm.

I.

Ashley Grayson met Olivia Johnson the way many people do in the internet age: online. In this instance, Grayson reached out to Johnson on Facebook. At the time, Grayson was a social media influencer in Dallas who made her name helping people repair their credit. She believed that Johnson, a Memphis resident, might help her expand her influencer realm into the Memphis

market. So she messaged Johnson, offering her credit repair services in return for Johnson promoting Grayson's business on her social media. The exchange proved mutually beneficial, resulting in an uptick in both Grayson's business and Johnson's credit score.

The two remained in contact in the ensuing years, even meeting in person when Grayson visited Memphis. At a later point, Grayson reached out to Johnson to express her desire to buy a house for a single mother needing help. Johnson suggested some possible beneficiaries of Grayson's goodwill, one of whom was Johnson's mother. And when Grayson eventually selected a recipient, it was Johnson's mother, with Grayson purportedly purchasing her a new home.

Why purportedly? Johnson was under the impression that the home would be "100 percent" her "mother's house." Trial Tr., Mar. 26, 2024, R. 144, PageID 1211. In reality, however, Grayson's name remained on the deed. While Johnson's mother lived in the home rent-free, she had no legal claim to the property. Eventually, the situation became a point of contention between Johnson and Grayson, a dispute that spilled over onto social media. Around the same time, numerous other social media users began accusing Grayson of scamming her clients and being an untrustworthy individual.

A few months later, Grayson invited Johnson and her husband, Brandon Thomas, to visit her in Fort Worth, agreeing to pay the pair's travel expenses. Johnson was under the impression that the reason for the trip was to resolve the issues with her mother's housing arrangement. Grayson, however, had other topics in mind. While Johnson was in the Lone State Star, Grayson drove her from Fort Worth to Dallas (Thomas rode separately with Grayson's husband). During the drive, Grayson raised the growing social media attacks against her and her business, expressing her displeasure with the situation. And she offered a purported solution—a request that Johnson

kill three people:  Sherell Hodge, who utilized the TikTok platform to criticize Grayson; Patrick Tate, Grayson's ex-boyfriend who had been threatening to release sensitive information about her; and Derricka Harwell, who, according to Grayson, had created fake social media accounts to spread negative information about Grayson's business and had released Grayson's home address to her followers.  Grayson indicated that she had cash with her to make a payment towards the murders.

When the group arrived in Dallas, Grayson reiterated her desire to have Johnson and Thomas carry out the murders.  Grayson offered the duo $20,000 to kill Hodge, $30,000 to kill Tate, and another $30,000 for the murder of Harwell.  Johnson and Thomas told Grayson they would carry out the plot.  Johnson also told Grayson that future conversations should take place over FaceTime, a video communication platform accessible through a cell phone, because, according to Johnson, FaceTime calls are not traceable, meaning the group could speak "without anyone knowing what [they were] talking about."  Trial Tr., Mar. 27, 2024, R. 145, PageID 1257.

Unknown to Grayson, the pair had no intention to follow through.  Rather, Johnson and Thomas planned to "play along" while collecting evidence of the crime. *Id.* at PageID 1253.  Once they had proof of Grayson's scheme, the two agreed, they would "[t]urn it over" to authorities to ensure their own safety. *Id.*  Additionally, Johnson hoped to make an incriminating video of Grayson so that she could sell it to TMZ, a gossip website, or use it as leverage to get Grayson to sign over the deed to the home.

Once back in Memphis, Johnson followed up with Grayson via text.  Johnson reiterated that she and Thomas were committed to the plan but asked for assurance from Grayson in the form of a deposit.  Grayson was hesitant to discuss the "business plan" over text. *Id.* at PageID 1258.

3

Eventually, the two women FaceTimed to discuss the details. Unknown to Grayson, Johnson was using Thomas's phone to secretly record the call. During the call, Johnson told Grayson that she and Thomas had already been to Harwell's home and that it would be "real easy to get her." Tr. Ex. 11, Video Clip 1, at 00:18–00:22. Grayson again indicated that she wanted Harwell killed as soon as possible.

The call ended with Johnson telling Grayson to "[b]e looking out for us tonight," as she and Thomas planned on going to Harwell's home that evening. *Id.*, Video Clip 2, at 01:45–02:02; *see also* Trial Tr., Mar. 27, 2024, R. 145, PageID 1270. After hanging up, Johnson later used Thomas's phone to send herself the recording. In the process, however, the 5-minute recording was split into two separate clips, with approximately 26 seconds of footage lost. Johnson then deleted the original recording from Thomas's phone.

The two did not attempt to kill Harwell. Instead, they FaceTimed Grayson from an unrelated crime scene. Against a backdrop of lights and sirens, Johnson claimed that she and Thomas had "shot . . . up" Harwell's home. Trial Tr., Mar. 27, 2024, R. 145, PageID 1273. When Johnson asked Grayson for payment, Grayson agreed to pay them $10,000. Johnson and Thomas immediately traveled to Texas to collect.

Not long thereafter, however, Johnson and Grayson's relationship broke down. Permanently so, it seems, when Johnson sent Grayson a clip of the recorded FaceTime call. Grayson accused Johnson of threatening her. Grayson later contacted the FBI, informing them of Johnson's alleged extortion. Grayson then sent Johnson a voicemail of an FBI agent following up on her complaint.

At this point, Johnson involved her attorney. On his advice, she provided federal agents with the recorded FaceTime call as well as text messages between her and Grayson. Based on the information Johnson provided, Grayson was indicted for conspiring to commit murder-for-hire of Harwell, in violation of 18 U.S.C. § 1958.

In the lead up to trial, Grayson raised a host of challenges to the admissibility of the FaceTime recording. She argued that the video was obtained in violation of the Federal Wiretap Act and therefore inadmissible. She also asserted that because the video was split into two segments and missing content, it was no longer an original copy and could not be used as evidence. The district court rejected both challenges, concluding that, because the government was not involved in the making of the recording, a "clean hands exception" applied to the Federal Wiretap Act and, further, that the video segments were admissible as duplicates of the original call.

At trial, Grayson again objected to the admission of the recording, this time on the basis that the two clips were not properly authenticated. Again, the district court overruled her objection, and a disk containing both portions of the FaceTime recording was received into evidence. She likewise unsuccessfully challenged an assortment of the court's jury instructions. In the end, the jury convicted Grayson. She now appeals.

## II.

A. Grayson leads off with a host of challenges to the admission of the FaceTime recording. Among them, that the recording's admission was barred both by the evidentiary rules as well as the Federal Wiretap Act. We review the district court's ultimate decision to admit the footage for abuse of discretion. *United States v. Morales*, 687 F.3d. 697, 701 (6th Cir. 2012). Of course,

underlying legal questions—like what the Federal Wiretap Act requires—get de novo review. *E.g.*, *United States v. Murdock*, 63 F.3d 1391, 1393 (6th Cir. 1995).

*Rule 901 and Authentication.* Grayson first contends that the FaceTime conversation recording was improperly authenticated. Turn, then, to Federal Rule of Evidence 901, which addresses the means for authenticating evidence for purposes of making it admissible at trial. To properly authenticate a piece of evidence "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The authentication requirement "represent[s] a special aspect of relevancy." Fed. R. Evid. 901(a) Advisory Committee Note (1972). Authentication, however, is a "relatively low[] hurdle." *United States v. Farrad*, 895 F.3d 859, 878 (6th Cir. 2018). One way to clear this modest bar is by offering testimony of a witness with knowledge "that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

Measured by these standards, the recordings were properly authenticated. At trial, the government called Johnson to testify about the FaceTime call. She told the jury that while in Dallas, she and Grayson discussed using FaceTime as an "[un]traceable" method of communication to discuss the murder-for-hire plot. Trial Tr., Mar. 27, 2024, R. 145, PageID 1257. Johnson recounted her plan to record the calls to collect evidence and hopefully, make money. She told Grayson, "FaceTime me when you can," with the purpose of discussing "the murder for hire plan." *Id.* at PageID 1264. Johnson said she used her phone to make the call and her husband's phone to record the conversation, later texting the footage to herself. She further told jurors that she had reviewed the disk containing the portions of the recording, confirmed it contained the call, and had initialed it after reviewing its contents. *Id.* at PageID 1265. To be sure, as Grayson notes, the government, while authenticating the video, was not as precise as it could have been.

For example, the government could have put each clip on its own disk and had Johnson testify that each portion of the recording was taken from her FaceTime call with Grayson. But Johnson later explained that when she sent the video to herself, the recording split into two clips, losing a bit of footage in the process, allowing the jury to take this into account when it weighed the evidence. *Id.* at PageID 1271–72. Taken together, Johnson's testimony provided a sufficient basis for the jury to find that the footage is what Johnson claimed it was—segments of the recorded call.

Seeing things otherwise, Grayson claims that the recording could not be authenticated due to the omitted 26 seconds. Appellant Br. 24. With footage missing, she says, the disk is incomplete and therefore, an inauthentic record of the call. This argument seems to miss the point. "The key question under Federal Rule of Evidence 901 is whether 'the matter in question is what its proponent claims.'" *United States v. Damrah*, 412 F.3d 618, 628 (6th Cir. 2005). The government established the evidence was indeed portions of the recorded call through Johnson's testimony. If Grayson believed the video was "distorted in some significant way, or was edited and therefore misleading," that objection would better be "resolved pursuant to Federal Rule 403." 2 McCormick on Evidence § 216 (Robert M. Mosteller, ed., 9th ed. 2025) (footnote omitted); *see* Fed. R. Evid. 403 (allowing for the exclusion of "relevant evidence if its probative value is outweighed by a danger of . . . unfair prejudice"). In the end, satisfying Rule 901 merely renders the recordings admissible; whether the evidence has persuasive value, and, in particular, whether it leaves out critical information that undermines its evidentiary value, are issues left for the jury. *See United States v. Jones*, 107 F.3d 1147, 1150 n.1 (6th Cir. 1997).

Nor, in any event, does the missing footage call into question the recording's authenticity. Grayson, we note, "does not question the fact that [she] and [her] words [were] depicted in the videotapes." *Damrah*, 412 F.3d at 628. Nor does she provide any basis for us to conclude that the

7

missing footage posed any real problem or contained particularly salient information. In fact, she admitted to the FBI that she "initially fell for the ruse," told agents that the incriminating FaceTime video of her existed, and later "renounced her recorded statements." Appellant Br. 15. At bottom, then, there is no dispute that the video is what it purports to be—segments from the FaceTime call between Johnson and Grayson. *See Asociación de Periodistas de Puerto Rico v. Mueller*, 680 F.3d 70, 79–80 (1st Cir. 2012) (holding there was "no serious basis for disputing the authenticity of" contested evidence where the plaintiffs claimed that the videos were "incomplete" and "extensively edited" but did not "say that the videos do not show actual footage of the incident in question"). Rule 901, in short, was no bar to the video's admission.

*Admission of a Duplicate and the Best Evidence Rule.* Grayson likewise believes the recording was inadmissible because it was a duplicate, not the original. Her challenge implicates the so-called "best evidence rule," which provides that "an original . . . recording" is generally needed "to prove" the recording's "content." Fed. R. Evid. 1002. But a duplicate is "admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." Fed. R. Evid. 1003. A duplicate may also come into evidence when the original has been either lost or destroyed by a proponent not acting in bad faith. Fed. R. Evid. 1004. In this case, both parties agree that the clips of the FaceTime recordings are duplicates for the purposes of these rules. *See* Appellant Reply Br. 10; Appellee Br. 24.

The district court did not abuse its discretion in finding the video clips were admissible. As discussed, Johnson's testimony provided an adequate basis for the jury to conclude that the footage "was an authentic 'duplicate' of the excerpted portions of" the FaceTime recording;

the footage "was therefore admissible under Rule 1003's exception" allowing duplicates. *United States v. Ehmer*, 87 F.4th 1073, 1124 (9th Cir. 2023).

Grayson counters that the omitted footage makes it "unfair to admit the duplicate." Fed R. Evid. 1003. In her view, that part of the full call was missing from the video suggests that Johnson edited the video and removed content, material Grayson claims was exculpatory. But this assertion alone does not affect the video's admissibility. As a leading evidence treatise explains, when a duplicate is challenged "on the ground that the original has been altered after copying, it would seem absurd to read Federal Rule of Evidence 1003 to bar admission of the duplicate." 2 McCormick on Evidence, *supra*, § 236. Rather, in that instance, we may permissibly treat the "altered original as 'destroyed' within the meaning of Federal Rule 1004." *Id.* at n.21; *see also Ehmer*, 87 F.4th at 1124 (holding that a duplicate, which defendant claimed was altered, was still admissible under Rule 1004 because the original had been destroyed); *cf. Asociación de Periodistas de Puerto Rico*, 680 F.3d at 80 (rejecting similar best evidence challenge where defendant claimed that video footage was an altered duplicate). Under this exception to the best evidence rule, if "all the originals are lost or destroyed, and not by a proponent"—here, the government—"acting in bad faith," an original is not required, and other evidence may be used to prove the content of the recording. Fed. R. Evid. 1004(a). Given Johnson's explanation that she deleted the video after sending herself a copy, and that the video split into two clips simply due to it being sent, the district court had ample grounds to conclude that the original recording was lost through no fault of the government. *Ehmer*, 87 F.4th at 1124; 2 McCormick on Evidence, *supra*, § 231, text accompanying n.2. It was then up to the jury to decide if the disk "accurately reflect[ed] the content" of the call. Fed. R. Evid. 1008(c). The district court did not abuse its discretion in admitting the disk and reserving the question of accuracy for the jury.

*The Federal Wiretap Act.* Grayson raises one final challenge to the admission of the FaceTime call: it was an illegally intercepted electronic communication and thus inadmissible.

Some background helps set the stage. Title III of the Omnibus Crime Control and Safe Streets Act of 1968, *see* Pub. L. No. 90-351, tit. III, 82 Stat. 197, 211–25, commonly known as the Federal Wiretap Act, makes it unlawful to "intentionally intercept . . . any wire, oral, or electronic communication," 18 U.S.C. § 2511(1)(a). To "intercept" means to "acqui[re] . . . the contents of [the] communication through the use of any electronic . . . device." *Id.* § 2510(4). Relevant here is the fact that when communications are illegally intercepted, they may not be used as evidence in a subsequent trial or hearing. *Id.* § 2515.

The Act, however, carves out a number of exceptions to the bar on intercepting communications. One is the so-called "one-party consent" rule. When the "person" who "intercept[s]" the communication is also a party to the communication, or when one of the parties "has given prior consent" to interception, the interception is not unlawful. *Id.* § 2511(2)(d). But there is an exception to the exception: When the "communication is intercepted for the purpose of committing any criminal or tortious act," the carve-out does not apply. *Id.*

According to Grayson, this latter carve-out addresses Johnson's conduct—using her husband's phone to record her call with Grayson for the purpose of extorting Grayson into giving Johnson's mother her home's deed. Appellant Br. 43. It follows, says Grayson, that Johnson's recording "intercept[ed]" their "electronic communication" "for the purpose of committing" the "criminal . . . act" of extortion, meaning Johnson violated the Act, and that the footage could not be used at trial as a result. 18 U.S.C. § 2511(1)(a), (2)(d).

While Grayson may be correct in some respects, ultimately, the legality of the recording has no bearing on its admissibility. That is because the clips of the recorded call are covered by the "clean hands" exception established by *United States v. Murdock*, 63 F.3d 1391 (6th Cir. 1995). There, Murdock's wife, having become suspicious of her husband's business activity, decided to record telephone calls made on the family's home phone. *Id.* at 1392–93. The recordings revealed that Murdock, the President of the Detroit School Board, had been accepting bribes from a local business and, in return, was providing the company with a lucrative contract. *Id.* Copies of the taped calls eventually made their way to authorities, who indicted Murdock on charges of tax evasion. *Id.* Relying on § 2515's exclusionary rule, Murdock moved to have the tapes suppressed. *Id.* We rejected this argument. Despite the fact that the recordings were illegally intercepted, we held that suppression is not warranted in a criminal prosecution where the "government played no part in the unlawful interception." *Id.* at 1404.

So too here. The government neither made nor encouraged the FaceTime recording. Rather, Johnson, a private party, gathered this evidence for her own ends, only later turning the video over to federal agents. Our precedent thus commands that Grayson, like Murdock, "does not enjoy the . . . right to suppression." *Id.* (She may separately have the right to bring a civil suit against Johnson, *see id.*).

Resisting this conclusion, Grayson counters that *Murdock* should be overruled because it cannot be squared with the plain text of § 2515. Appellant Br 44; Reply Br. 9. Specifically, she says, § 2515 unambiguously prohibits the use of any improperly intercepted communications as evidence, without regard to whether the government was involved in the procurement. Appellant Br. 44; 18 U.S.C § 2515 (explaining that when "any . . . communication" has been illegally intercepted "no part of the contents of such communication . . . may be received in evidence").

11

On this basis, several of our sister circuits, she notes, have refused to read a clean hands exception into the statute. *See United States v. Crabtree*, 565 F.3d 887, 889 (4th Cir. 2009); *Chandler v. U.S. Army*, 125 F.3d 1296, 1302 (9th Cir. 1997); *In re Grand Jury*, 111 F.3d 1066, 1079 (3d Cir. 1997); *United States v. Vest*, 813 F.2d 477, 481 (1st Cir. 1987). We do not discount Grayson's textual analysis, the touchstone for modern day statutory interpretation. *See Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021) (explaining that we interpret statutes by first exhausting "all the textual and structural clues bearing on [its] meaning" (citation modified)). Nor would we likely consider the statute's legislative history in interpreting that text in the way *Murdock* chose to do. *See Murdock*, 63 F.3d at 1404 ("[I]t is appropriate under the legislative history . . . to apply a 'clean hands' exception to Section 2515"); *but see Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (noting that legislative history is "illegitimate" as "[w]e are governed by laws, not by the intentions of legislators"). Indeed, the use of legislative history was particularly unusual in *Murdock*, where the panel relied on the fact that, to its mind, "nothing in the legislative history" spoke against the "clean hands" exception. *Murdock*, 63 F.3d at 1403. But for today's purposes, we are bound by *Murdock*, which, as Grayson acknowledges, forecloses a panel of three from holding otherwise. *See, e.g.*, *United States v. Ferguson*, 868 F.3d 514, 515 (6th Cir. 2017) ("One panel of this court may not overrule the decision of another panel; only the en banc court or the United States Supreme Court may overrule the prior panel."); *see also* Reply Br. 9 ("Appellant acknowledges *Murdock* binds this panel . . . ."). Right or wrong, in other words, *Murdock* controls.

B. Grayson also raises two challenges to the jury instructions.

*Preliminary Instructions.* Grayson believes that the district court, in delivering its preliminary instructions to the jury, improperly commented on the evidence, and later erred in

12

denying her a mistrial on that basis. We review the district court's denial of Grayson's motion for a mistrial for an abuse of discretion. *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010).

Begin with the relevant factual background. Before evidence was presented in this case, the district court gave the jurors preliminary instructions. One instruction addressed proving a defendant's state of mind. The district court told jurors that "[o]rdinarily, there is no way that a defendant's state of mind can be proved directly." Trial Tr., Mar. 26, 2024, R. 144, PageID 1116. But, the court added, "if [the government] could have a recording that says, I'm going to kill somebody, that might be important." *Id.* The court then reminded jurors that "you still have to ask yourself at the end: Has the Government met that burden . . . ?" *Id.* at PageID 1117. Grayson objected, asserting that the court's example amounted to an improper comment on the evidence, and moved for a mistrial. The court denied the motion for a mistrial and instead gave the jury a curative instruction. The court told jurors that the example it had used was "not really appropriate," and asked them to "disregard [it]." *Id.* at PageID 1130, 1132. The court explained that it was not "saying that [the aforementioned example] is a basis or a sufficient basis to draw any conclusion about anything." *Id.* at PageID 1132. And it reminded jurors it was their job to draw inferences from the evidence. *Id.* Following these clarifications, Grayson again asked the court to declare a mistrial, to no avail.

As a threshold matter, there is no per se bar on a district court commenting on the evidence when instructing the jury. Judges are "not limited to instructions of an abstract sort." *United States v. Blakeney*, 942 F.2d 1001, 1013 (6th Cir. 1991) (quotation omitted). Rather, a judge may "assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence . . . provided [the court] makes it clear to the jury that all matters of fact are submitted to their determination." *Id.* (quotation omitted). But in so doing, the court must act "with great care and

may not unduly prejudice the jury." *United States v. Martin*, 740 F.2d 1352, 1357 (6th Cir. 1984). After all, while the court may "analyze and dissect the evidence," it may not "distort or add to it." *Blakeney*, 942 F.2d at 1013.

Defining the line between a permissible comment and a prejudicial one is not always easy. But in close cases, a curative instruction can help ensure that no prejudice infected the jury's consideration of the case. Consider, on this point, *United States v. Frederick*, 406 F.3d 754 (6th Cir. 2005). There, the defendant was charged with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). *Id.* at 758. While instructing the jurors on this charge, the district court made comments "suggest[ing] that some of the factors tending to support conviction were undisputed." *Id.* at 762. In particular, the court stated that "we know the type of firearm that was involved," indicated that the jury knew the gun was "found in relation to the drug activity that had occurred," and told jurors that the "drug proceeds" would be the "money" they had heard testimony about. *Id.* (emphasis omitted) (internal quotation marks omitted). Those comments prompted an objection from the defendant, at which point the court agreed to give a curative instruction, reminding the jurors that they were the ultimate finders of fact, free to believe or disregard any testimony. *Id.* On appeal, after noting that "[i]n a close case, with no curative instruction, such remarks might raise a question," we concluded that the "prompt and explicit curative instruction . . . eliminate[d] any danger that the jury might draw an improper conclusion from the court's prior remarks." *Id.*

With *Frederick* as a guide, we cannot say that the district court's comments here unduly prejudiced the jury. The court told jurors that a piece of evidence "*might* be important" to determining intent. Trial Tr., Mar. 26, 2024, R. 144, PageID 1116 (emphasis added). This comment expressed a less definitive view on the evidence than the statements at issue in *Frederick*.

14

The district court's use of conditional language here made clear that the jury was the ultimate finder of fact and that it was free to reject any video evidence as relevant to intent. *Blakeney*, 942 F.2d at 1013. What is more, much like *Frederick*, the court acknowledged that its comments were inappropriate, following them up with an explicit curative instruction telling the jurors to disregard that example and reminding them it was their job to draw conclusions from the evidence. Considered as a whole, the district court's preliminary instructions do not warrant reversal.

Seeing things otherwise, Grayson attempts to analogize the comments here to two cases in which the district court's comments were deemed "[t]ruly serious errors" that "may automatically require reversal." *Frederick*, 406 F.3d at 762. But in each of those cases, the district court in question commented before the jury on the ultimate question of guilt—unlike here, where the comments at issue at most loosely indicated that some evidence may be important to intent. In *United States v. Martin*, 740 F.2d 1352 (6th Cir. 1984), for example, the district court, following the defendant's testimony, remarked to counsel that "he is guilty." *Id.* at 1357. On that record, we reached the sensible conclusion that if it was discovered on remand that any jurors overheard the judge opining on the ultimate question of guilt, the conviction could not stand. *Id.* Similarly in *United States v. Yates*, 553 F.2d 518 (6th Cir. 1977), the judge remarked in front of the jury that the defendant's alleged confession made "clear" that he "did admit his participation in this bank robbery." *Id.* at 520 n.1. But the defendant had claimed that the confession was coerced. We held that this comment essentially stripped Yates of his defense and therefore, was improper. *Id.* at 521. Again, the district court's comments here were nowhere near as flagrant as those in *Martin* and *Yates*.

2. *Wharton's Rule.* Finally, Grayson argues that the district court should have given a Wharton's Rule instruction regarding her conspiracy charge. As she did not raise the issue in

15

district court, we review only for plain error. *United States v. Aaron*, 590 F.3d 405, 408 (6th Cir. 2009). Under this demanding standard, Grayson must show (1) an error, (2) that is plain or obvious, (3) that affected her substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Burrell*, 114 F.4th 537, 554 (6th Cir. 2024). She fails to do so.

To understand Grayson's argument, begin with the background principle of criminal law that a conspiracy does not merge with the substantive offense that is its goal. *Iannelli v. United States*, 420 U.S. 770, 782 (1975). In the drug crime setting, for example, a defendant can be found guilty of both distributing illegal drugs and for conspiring to do so. 21 U.S.C. §§ 846, 841; *see also United States v. Sadler*, 24 F.4th 515, 528 (6th Cir. 2022). Wharton's Rule, however, developed as an exception to this general practice. If a substantive offense "necessarily require[s] the participation of two persons for its commission," a defendant cannot be prosecuted for conspiracy. *Iannelli*, 420 U.S. at 773 n.5. Put differently, when a crime requires two parties to commit the offense, there must be at three individuals involved in a conspiracy to commit that crime. That is so because, as the Rule's logic goes, "two parties cannot conspire to commit a substantive crime when the crime *itself* requires two parties for its completion (such as dueling or prostitution)." *United States v. Wheat*, 988 F.3d 299, 307 (6th Cir. 2021). Supreme Court precedent instructs that we presume Wharton's Rule applies to a conspiracy statute unless the text suggests otherwise. *Iannelli*, 420 U.S. at 786.

But Wharton's Rule's merger principle has no place here. The "Rule applies only to offenses that require concerted criminal activity, a plurality of criminal agents." *Iannelli*, 420 U.S. at 785. And precedent dictates that 18 U.S.C. § 1958, the offense Grayson was charged with committing, is not the type of two-persons-needed substantive offense to which the Rule applies.

16

Rather, § 1958 can be violated by a "sole perpetrator." *United States v. Ransbottom*, 914 F.2d 743, 746 (6th Cir. 1990). As we explained in *Ransbottom*, the statute is not "solely an anti-conspiracy statute," and holding otherwise would "do violence to the statute's plain meaning." *Id.* To that end, a single person can use a facility of instate commerce for murder-for-hire alone by soliciting, attempting to hire, or arranging the murder—even if there is no actual second person who agrees to (or commits) the murder. *Id.* (explaining that the statute allows conviction if a single defendant uses interstate commerce "with the intent that a contract murder be committed"). And because the substantive offense—using a facility of interstate commerce to plan a murder-for-hire—does not require two parties for completion, § 1958 is not the type of statute to which Wharton's Rule could apply. *See United States v. Hernandez*, 141 F.3d 1042, 1052 (6th Cir. 1998) (explaining that the substantive offense of murder-for-hire is a "separate and distinct crime[]" from the conspiracy to commit murder-for-hire).

Resisting this conclusion, Grayson urges us to look beyond the text of the statue. In her view, "the statute" was in effect "modified by the indictment." Appellant Br. 53. How? As she explains things, to convict her of conspiracy, the jury had to find she "hired someone to commit a murder and entered into a conspiracy with another to facilitate the murder." *Id.* Thus, she claims, the offense with which she was charged could not have been committed by a "sole perpetrator." *Id.* For support she points to language in the jury instructions where the district court, summarizing the indictment, told jurors that Grayson and her husband were accused of "conspiring with each other and with others known and unknown." *Id.* (emphasis omitted) (quoting Jury Instrs., R. 123, PageID 480). Tallying this up, Grayson concludes that the indictment contemplated at least three people (a person who hired another to commit murder, a person hired for the offense, and a separate conspirator) committing the crime—thus, in her view, implicating Wharton's Rule. *Id.*

17

But this is not how the inquiry works. We "focus[] on the statutory requirements of the substantive offense rather than the evidence offered to prove those elements at trial." *Iannelli*, 420 U.S. at 780. The mere fact that an indictment charges multiple people with committing an offense together, in other words, does not mean that "the crime *itself* requires two [or more] parties for its completion." *Wheat*, 988 F.3d at 307. That is a question of "legislative intent," *Ianelli*, 420 U.S. at 782, as evidenced by "the statute's plain meaning," *Ransbottom*, 914 F.2d at 746. And on that front, as Grayson admits, our precedent instructs that murder-for-hire can involve a single perpetrator. Appellant Br. 53 (citing *Ransbottom*, 914 F.3d at 746). In short, the district court did not err in failing to give a Wharton's Rule instruction.

\*     \*     \*     \*     \*

We affirm.